R. B. TIPPETT & BRO.

*vs.*

OLIVIA R. MYERS.

*Partnerships: individual liability; not for torts beyond scope of business; attorneys-at-law; investments for clients; fraud; proof.*

A plea not denying the partnership alleged in a declaration, admits the partnership only, and does not admit that the transaction sued on was within the partnership scope.   p. 531

The statute suspending the running of limitations when the plaintiff has been kept in ignorance of his cause of action by the defendant's fraud, does not apply against a partner who has been guilty of no fraud or wrongdoing in the transaction.
p. 532

A member of a law firm, not engaged in the business of investing moneys for clients, is not responsible for the acts of a co-partner in making an investment, which does not appear on the firm books and of which he has no knowledge.   pp. 534-535

It was error to permit the plaintiff (who had brought suit for moneys lost by an attorney to whom she had entrusted them for investment) to testify what she *thought* was his law partner's connection with the transaction.   p. 535

An attorney, with general authority to invest, who invested eight hundred dollars of his client's money and seven hundred dollars of his own money in a loan, taking therefor one promissory note for fifteen hundred dollars secured by speculative

stock, and receiving no compensation from his client for the investment, was not necessarily guilty of fraud for making an undisclosed arrangement with the borrower by which the attorney was to receive a percentage of any prospective enhancement in the value of the stock, when this undisclosed prospective profit could only have been received after repayment of his client's money.        pp. 537-538

A client who, in such case, knew shortly after the loan was made, over six years before the institution of the suit, what the character of the security was, and that the stock certificate was in the lawyer's name, and who finally severed relations with her counsel nearly four years before the institution of the suit, and failed to make any inquiry as to the circumstances of the transaction, did not exercise the usual and ordinary diligence necessary to suspend the running of limitations where ignorance of the cause of action is relied on for such suspension.

p. 538

*Decided January 14th, 1916.*

Appeal from the Baltimore City Court. (GORTER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, THOMAS, URNER and STOCKBRIDGE, JJ.

*Eugene O'Dunne* and *George W. Lindsay* (with whom was *Donald B. Creecy* on the brief), for the appellants.

*Laurie H. Riggs* and *J. Marsh Matthews,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellee sued the appellants in assumpsit on the common counts and attached to the declaration there was an account as follows:

"Baltimore, Md., July 10, 1914.
"Richard B. Tippett and James E. Tippett, co-part-
ners trading as R. B. Tippett & Bro.,
                To      Olivia R. Myers,   Dr.
"May 11, 1908.   To Cash collected and re-
tained. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$800.00
"To interest on same from October 1, 1909 (the inter-
est on said sum having been paid to that time)
to date."

The record states that annexed to the declaration was an
affidavit under the Act of 1886, Chapter 184, which with
amendments is the Practice Act of Baltimore City, Sec. 312,
etc., of Art. 4 of Public Local Laws. The defendants plead,
separately, the pleas of never indebted, never promised and
limitations. The plaintiff joined issue on the first and second
pleas and replied to the third, alleging fraud. The defend-
ants filed rejoinders to the replications to their pleas and
issues were joined. The trial resulted in a verdict for plain-
tiff for $800.00, and this appeal was taken from the judg-
ment rendered thereon.

There are nine bills of exceptions presenting rulings on the
evidence, and a tenth containing the rulings on the prayers.
The plaintiff offered six prayers—the first and fourth of
which were granted and the others rejected. R. B. Tippett
offered five and J. E. Tippett four, separately, and they
offered one jointly which is marked defendants' sixth prayer,
all of which were rejected.

We will first consider the prayers. The plaintiff's first
is as follows: "The plaintiff prays the Court to instruct the
jury that the partnership of the defendants, Richard B.
Tippett and James E. Tippett, having been alleged in the
declaration filed by the plaintiff, and not having been denied
by the next succeeding pleading of the defendants, or either
of them, said partnership is admitted for the purpose of this
cause." As the suit was brought under the Practice Act in
force in Baltimore City, the prayer ought to have referred

to the affidavit as well as to the declaration, as the statute so requires in order to put the defendant in default in not pleading, etc., but apparently in drawing it the plaintiff had in mind the general law, Article 75, Sec. 24, sub-sec. 108, of the Code of Public General Laws. The affidavits are not in the record, but if those of the defendants stated what is required by the local law, it would not have been necessary to have had pleas denying the partnership. *Farmers, etc., Bank* v. *Hunter,* 97 Md. 148; *Horner* v. *Plumley, Ibid.* 271. But regardless of that technical question, in our judgment the prayer was not proper under the facts of this case, notwithstanding it uses the language of the statute that "said partnership is admitted for the purpose of this cause." The attorneys for the appellee seem to be of the opinion that the prayer contained all that is required, but we do not so understand the meaning of that expression. In *Fifer* v. *Clearfield Coal Co.,* 103 Md. 1, the suit was not brought under the local law, and the Court passed on the meaning of Article 75, Sec. 24, sub-sec. 108, which provides that "Whenever the partnership of any parties, or the incorporation of any alleged corporation, or the execution of any written instrument filed in the case is alleged in the pleadings in any action or matter at law, the same shall be taken as admitted for the purpose of said action or matter, unless the same shall be denied by the next succeeding pleading of the opposite party or parties." The *narr.* alleged that the appellant "entered into a written contract with the said defendant, by said Rogers, Holloway & Co., the agents of the said defendant, who were then and there * * * duly authorized by said defendant to execute said contract in its behalf." The written contract was then set out *verbatim* in the declaration, and the appellant contended that as it had not been denied by the appellee by its next succeeding pleading, it must be taken as admitted for the purpose of the action as well as the agency of Rogers, Holloway & Co. This Court said, "Such a construction, however, is broader than that warranted by the

terms of the statute, which are * * * (quoting the statute). The words 'the same shall be taken as admitted for the purpose of said action or matter' refer to the allegations of 'partnership of any parties,' 'the incorporation of any alleged corporation,' and 'the execution of any written instrument' alleged in the pleadings. The failure to deny any of these in the next succeeding pleading operates as an admission against the opposite party." Then after quoting from *Banks* v. *McCosker*, 82 Md. 525, at some length, the Court said: "The failure of the appellee to make denial of the execution of the contract as set out in the declaration, had the effect only of relieving the appellant of proving it, but it did not admit that Rogers, Holloway & Co. were the agents of the appellants with authority to bind them as charged in the *narr*. That was put in issue by the pleas, and was open for proof as any other fact that had been alleged."

So in this case the fact that the defendants were partners is admitted, but does not admit that the suit was on a partnership transaction, or that what one partner did in reference to it necessarily bound the other. The defendants could not truthfully have sworn that they know, or had good reason to believe such allegation of co-partnership to be untrue as the Practice Act provides. The failure to deny the partnership had the effect only of relieving the appellee of proving it, to follow the language used in *Fifer's case*. Surely if this Court was right in that case, where the declaration expressly alleged that the written contract was entered into with the appellee by Rogers, Holloway & Co., the agents duly authorized by them to execute it, in saying that their failure to deny the execution did not admit that these parties were the agents with authority to bind them, the failure to deny the partnership could not take from these defendants the right to prove that it was not a partnership transaction. The case of *Whitman, et al.,* v. *Wood,* 6 Wis. 676, is quite analagous, but we need not further refer to it. The prayer as granted was misleading, even if the lower Court did not intend to go as far

as the appellee now contends is the result of the failure to
deny the partnership, and there was error in granting it—
particularly as no other prayer was granted which limited
or explained its meaning. The plaintiff's fourth prayer was
also defective, if for no other reason from the fact that it
entirely omitted all reference to the ten dollars which the
plaintiff received from James E. Tippett, which had been
paid him by Mr. Yardley. It said nothing about the stock
which the appellee still holds, and which so far as the record
shows may still have some value, but in view of the conclu-
sion reached by us in reference to the defendant's first
prayer, it would serve no good purpose to discuss that.

The first prayer offered by Richard B. Tippett was as fol-
lows: "The defendant, Richard B. Tippett, prays the Court
to instruct the jury that under the pleadings there is no evi-
dence in this case legally sufficient to entitle the plaintiff to
recover against this defendant, and therefore the verdict
of the jury must be for the defendant."

In our judgment that prayer should have been granted. In
the first place, the statute of limitations was a complete bar
to the action against him unless the plaintiff was kept in
ignorance by the fraud of the defendant. The replication to
that plea alleges that the plaintiff "was kept in ignorance by
the fraud of the said defendant for a long time of the cause
of action which she had against the said defendant, and that
she brought this action within three years from the time
at which she could by usual and ordinary diligence have
discovered the fraud." There is no evidence whatever of
any fraud on the part of Richard B. Tippett—even if there
was on the part of James E. Tippett, which we will consider
later, yet the replication alleges that she was kept in ignorance
"by the fraud of the said defendant"—it being a reply to the
separate plea of Richard B. Tippett. The uncontradicted
evidence shows that he did not know of the transaction
between James E. Tippett and R. T. Yardley for more than
two years afterwards, when he was told of it by the plaintiff

herself. The plaintiff testified that when she spoke to R. B.
Tippett, he said he never heard of it, and when she told him
"about the matter he scolded her very much for entering
into such speculation." She said he suggested that she write
a letter to J. E. Tippett, which she did. That was sometime
in the fall of 1910—the letter is dated October 22, 1910. In
that letter she wrote, "First, in regard to the Yardley loan.
I must ask you to have this matter settled immediately. A
rather prominent lawyer to whom I mentioned this loan,
after he has heard that in the first place, said, you should
never have allowed me to consider this loan for a moment,
but that as long as it has been made it was your duty as my
lawyer, to safeguard my interests as much as possible and
see that I had ample security." (Something seems to have
been omitted in first part of this paragraph.) Again she
said, "I wish to know what value, if any, the stock has;
under the circumstances *I shall hold you personally respon-
sible for the loan."* She said the prominent attorney referred
to was Mr. Richard B. Tippett himself, and that the letter
was written "at his instigation." He testified that he never
saw the letter, and if he advised her to write one at all it was
provided she could not see James E. Tippett in person and
ask him about the matter, but he added, "I have no doubt she
wrote that letter after having talked with me, because she
wrote it feeling and very likely expressing, to some extent,
my feeling about the matter. That is why I suppose she
wrote the letter. I had nothing to do with the transaction
when it was made. James E. Tippett and I were in partner-
ship at the time of this particular transaction, when this
transaction was made, but we were partners practising law,
and I was not in partnership with him or anybody else
loaning money on mining stocks or buying stocks, and I
knew nothing of the transaction until Miss Myers told me
about it at the time I have mentioned." He had already
said, in speaking of the interview with the plaintiff, "I think
she has expressed about what I said at the time. I told her

that she had no right to invest her money in mining stocks, and that if she had ever consulted me about it, she would never have done so. I knew nothing about the value of the mining stock, but I did not consider that she had any right to invest in it, and that I would never have advised her to invest any money in mining stock." Sometime later —Mr. R. B. Tippett said it was in 1912, and apparently the plaintiff corroborates that, as she introduced a letter from him to her dated March 23, 1912—he went to see James E. Tippett about the matter at the request of the plaintiff. He said he told her that he did not like to do so, as it was a delicate matter for him. He testified that he said to James E. Tippett, "I would like you to go see Yardley and see if you can not get Yardley to pay off his interest and see if you can not get him also to pay the interest or secure the principal satisfactorily to Miss Myers," and he told him he would do so. That was considerably over a year after James E. Tippett had given her all of her papers and said he would act for her no longer. There was certainly nothing in any of those transactions which suggested fraud on the part of Richard B. Tippett, and he did what most attorneys would do, endeavored to help the daughter of a former client, who herself had also been his client, especially as his brother had made the loan, which he deemed an unwise one.

That would be sufficient to prevent recovery against Richard B. Tippett, but we think that under the evidence and the law he cannot be held as a partner in this transaction. There is nothing whatever to show that it was a partnership transaction beyond the mere fact that they were partners in the practice of law. It is not shown that the transaction in any way passed through the books of the firm, or that R. B. Tippett was in any way connected with it, or even knew of it. Miss Myers' father died in 1897 and R. B. Tippett assisted her in settling his estate. For several years he attended to her business, made investments of money then received by her, &c. At the end of several years R. B. Tippett

sent her to James E. Tippett, and from that day on the lat-
ter had all the investing of her money, although she says she
thought that it was under R. B. Tippett's cognizance. There
is nothing in the record to justify her in so thinking, but on
the contrary for about eight years, up to the time of this
transaction, James E. Tippett had attended to her invest-
ments, so far as either of the Tippetts did, had collected
interest for her, and remitted it in his own name. As we
have seen, as late as October 22nd, 1910, she wrote to him
"under the circumstances I shall hold you personally re-
sponsible for the loan"—referring to the loan in question in
this case. That letter is also in other respects utterly incon-
sistent with any idea on her part at that time of attempting
to hold R. B. Tippett. Not only that, but she went to him
to ask him to see his brother, she gave her receipt for the
stock to James E. Tippett, the stock she received was in his
name, and whenever she wrote she wrote to him and not to
R. B. Tippett & Bro., although she says James E. wrote to
her on paper that had the letter head of the firm on it. She
did not even mention the Yardley loan to R. B. Tippett for
more than two years after it was made, although she had
been having trouble in getting the interest. Both R. B. and
J. E. Tippett swore that the former had nothing to do with
the loan, and there is no evidence offered by the plaintiff to
show that he did—only what she said she thought, which is
not evidence. Although we will not discuss the exceptions
to the rulings on testimony, it may be well to say in passing
that there was error in permitting the witness to answer the
question embraced in the ninth exception when she was al-
lowed to say what she thought about R. B. Tippett's con-
nection with the business. Showing that R. B. Tippett was
her attorney in the matter of examining a title to property
in Montgomery County in 1910 confirms rather than weakens
our conclusion. It shows that when she wanted him she
went to him and employed him, but because he was attorney
in that, or possibly other transactions, would not make him
responsible for what James E. Tippett did in matters wholly

outside of the partnership. If a firm of attorneys is to be responsible for every act of each partner, whether concerning legal or other matters, then the liability of attorneys as partners is greater than that of any other partners. Of course if a firm undertakes to make loans, collect the interest and remit it, &c., the partners may be liable in such transactions, but that is not this case. Beyond all that, she is now in Court attempting to remove the bar of the statute of limitations on the ground that J. E. Tippett was personally interested in the loan. If he was acting for himself and not for her, why should R. B. Tippett be held liable? Without prolonging this opinion by further reference to the evidence, we are convinced that the first prayer of R. B. Tippett should have been granted on both of the grounds which we have mentioned—that the statute of limitations is a bar to recovery, and that this was not a partnership transaction.

Coming then to the question whether the first prayer of James E. Tippett should have been rejected. That uses the same language as the one offered by R. B. Tippett. After giving the question full consideration, we have reached the conclusion that it should also have been granted. If there was fraud on the part of James E. Tippett the plaintiff undoubtedly "could by usual and ordinary diligence have discovered" it more than three years before she brought this suit, which was instituted on July 11th, 1914. She knew on May 11th, 1908, that he had made the loan to Mr. Yardley, and she testified that the latter part of May or first of June, she went to the office of Mr. James E. Tippett and he gave her the stock, which was issued *in his name,* and when she received it, it was not endorsed. Her receipt for the stock is dated June 25, 1908—so at least as early as then she knew the stock was in his name and it was not endorsed until after the letter of October 22, 1910, when she called upon him, but she then had had possession of the certificates for over two years. In that interview he said he wanted nothing more to do with her affairs and turned over to her "all mortgages, deeds and everything of that sort" he had of hers, and she

received a note of Mr. Yardley for $848.00, principal and one year's interest, in a letter from James E. Tippett, dated November 5, 1910. That was apparently the last communication from him to her. As we have seen, she wrote to him on October 22, 1910, that she would hold him personally responsible for the loan. She therefore knew in 1910, nearly four years before the suit was brought, everything she now knows, excepting, "it was in the fall of 1912 that she first heard that Mr. James E. Tippett had any interest in the stock, and she found that out through inquiries of Mr. Yardley by her counsel, Mr. Riggs." But when she saw the stock was in his name she certainly might with usual and ordinary diligence have known or discovered what she now relies on, and certainly after he had refused to longer represent her—latter part of October or early in November, 1910—she could have had other counsel, as she subsequently did, and if she is right in her contention that it is evidence of fraud, she had sufficient knowledge to put her on inquiry.

It is only just to Mr. Tippett to say that he testified that he explained to her the transaction at the time—told her that he had put $800.00 of *her* money and $700.00 of *his* in the loan of $1,500.00 to Mr. Yardley. The fact is that he had done so, and he turned all of the stock over to her, giving her $800.00 priority over his $700.00. His interest in the stock to the extent of the $700.00 loan certainly did not injuriously affect her, as she not only had all of the stock to look to, but he was personally interesed in having her paid, in order that he might get his own back. But she claims that she did not know that he was to get one-third of the profits in case of sale. It was, of course, only possible to have profits after her claim was first paid, and then his $700.00, and we confess it is not easy to see fraud in that, even if he did not tell her, as we must assume in passing on the prayer. She knew that she was not paying anything for his services, that he had even turned over to her the $10.00 he had received as a bonus, and it is going pretty far

to say that it would be fraudulent for a broker or attorney to rely on profits for his compensation in case of sale, even if he did not tell his principal that he had such interest in it. It is not pretended that he told her he had no interest in the stock and she does not say she inquired of him why the stock was in his name. The certificates were dated in 1906, and it is, to say the least, remarkable that if he did not explain the matter to her, as he says he did, why she did not inquire what those facts meant. It will hardly do to say she did not know enough about business for she asked for the note and she noticed that he had not endorsed the certificates, which Mr. Tippett says was an oversight on his part. The transaction certainly shows that James E. Tippett had confidence in the stock, when he put nearly as much in the loan as the plaintiff had in it—in addition to relying on some profits on it for his compensation. It is therefore very questionable whether it can be said that there was any evidence of fraud, assuming all the plaintiff says to be true, but regardless of that we think the record abundantly shows that she might have discovered or known what she now calls fraud with usual or ordinary diligence, and hence as a matter of law, under the pleadings, she can not recover. In *Stieff Co.* v. *Ullrich,* 110 Md. 629, we quoted with approval what was said in *Foster* v. *Railroad,* 146 U. S. 88, that "the defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove. Hence the tendency of Courts in recent years has been to hold the plaintiff to rigid compliance with the law which demands not only that he shall be ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts." We are not unmindful of the rule that such a question in actions at law is usually for the jury, but where a plaintiff's own evidence shows that she had such knowledge as this plaintiff had, the Court is called upon to pass upon its legal sufficiency to meet the requirements of the statute, and to say whether she could

by usual and ordinary diligence have discovered the fraud, if there was any, more than three years before the suit was brought.   Nor do we overlook the importance of holding attorneys and agents to strict accountability, but they are entitled to the protection which the law affords them, as well as others, against unwarranted charges of fraud.   So we are of the opinion that the first prayer offered by James E. Tippett should have been granted.

That relieves us of the necessity of discussing the other prayers or the exceptions to the rulings on the testimony. We have not deemed it necessary to determine the question whether this form of action was the correct one under the circumstances, as that would involve the further question whether under the Act of 1914, Chapter 110, Sec. 9A of Art. 5, we could consider it under this prayer, but assuming that the action for money had and received was proper, we are of the opinion that for the reasons given the first prayer offered by each defendant should have been granted.   As our conclusion precludes a recovery, we will not remand the case.

> *Judgment reversed, without awarding a new trial, the appellee to pay the costs.*