[No. 26562. Department One. September 23, 1937.]

EUNICE BELL WALTERS, *Appellant*, v. FLORA B. CHRISTENSEN *et al., Respondents.*[1]

[1]Reported in 71 P. (2d) 664.

R. F. *Dotsch,* for appellant.

*Padden & Moriarty* and *Melvin T. Swanson,* for respondents.

GERAGHTY, J.—Olive R. Gunstone died intestate May 22, 1905. She was survived by her husband, John Gunstone, and their daughter, the plaintiff, Eunice Bell Walters, born May 22, 1899.

At the time of the wife's death, the Gunstones owned a farm in Thurston county, embracing some 529 acres. This land was community property, having been acquired after marriage. The community also owned some personal property, as well as an undivided one-half interest in twelve hundred acres of timber land. In addition to this, John Gunstone owned, as his separate property, some parcels of real estate acquired before marriage.

In 1907, Gunstone married his second wife, Flora B. Warren, now Flora B. Christensen, the defendant. She had a son, Charles, by a former marriage, who was adopted by John Gunstone. A daughter, Opal, now Opal Kelly, was born of the second marriage.

Gunstone took no steps to probate his deceased wife's will until 1911, when he was appointed administrator and, shortly thereafter, returned an inventory of the property belonging to the community estate of himself and his deceased wife. The inventory included the land referred to in the record as the home farm, appraised at $6,822; the half interest in the twelve

hundred acres; notes and mortgages, appraised at $3,321.08; and stock, farming equipment, and other items of personal property, appraised at $2,019. Nothing further was done in the probate proceeding.

Shortly after his appointment as administrator, Gunstone was appointed guardian of the person and estate of his daughter Eunice. In August, 1911, he petitioned, as guardian, for authority to sell his daughter's one-fourth interest in the twelve hundred acre tract. He assigned as the reason for selling the land the fact that it lay several miles distant from the home farm. The petition recited that it was for the best interest of the daughter that the property be sold at private sale, and that it was his purpose to invest her share of the proceeds in real estate mortgages at current rates of interest. Having been authorized by the court to do so, he sold the daughter's interest for $3,750. This sale was duly confirmed by order of the superior court, and conveyance made to the purchaser. No further proceeding or accounting was had in the guardianship matter.

Reference is made in the record to a timber deed executed by Gunstone, for a consideration of seventeen thousand dollars. It is not entirely clear as to the nature of this transaction or whether the named price was paid. Whatever money, if any, was received for the timber, no accounting was made of the daughter's interest if she had any.

The daughter continued to live with her father and step-mother until her marriage. She attended school in Olympia until twenty years of age, passing through the primary and high schools and later having some training in a business college. After her marriage, May 23, 1920, to I. B. Walters, she lived for a time in Olympia in a house furnished by her father; later, she

removed to Hood Canal, where her husband was engaged in a logging operation.

In 1922, while living on Hood Canal, she executed a quitclaim deed conveying to her father all of her interest in the community real estate of her mother. This included the farm as well as some other land. While there was a discrepancy in the description of one forty-acre subdivision of the farm, it is apparent, and the trial court took the view, that the deed was intended to convey the whole of the interest inherited from her mother.

John Gunstone died May 26, 1932. After application had been made by the receiver of the Olympia National Bank, as a creditor of the estate to the extent of ten thousand dollars, that J. C. Minshull be appointed administrator in default of an application for appoint-. ment by the wife, Mrs. Gunstone made formal application for letters of administration, and was appointed and qualified as administratrix. After her appointment, the administratrix published notice to creditors and filed an inventory in the estate, listing personal property of the value of $1,402.

Shortly before his death, John Gunstone and his wife, Flora B. Gunstone, conveyed to a corporation, the defendant Brookside Farms, Inc., all of the real estate holdings of John Gunstone, including the farm. Title to the farming equipment was also conveyed to the corporation by bill of sale. The record contains only scant information as to the organization of this corporation, but it is inferable that it was organized by the Gunstones as a family holding company.

February 4, 1933, the widow, Flora B. Gunstone, married Elhard Christensen. A few days thereafter, Eunice Bell Walters, the plaintiff, made demand upon her step-mother for an accounting and, on August 4, 1933, instituted this action.

Two principal causes of action are stated in the complaint. In the first one, the theory of the plaintiff is that the funds belonging to her, and held in trust by her father as guardian, were used by him in his business transactions, extending throughout a long and active life. She did not state precisely what form of relief she sought, and, at the outset of the trial, the court granted a motion, interposed by the defendants, requiring her to elect whether she sought an accounting and money judgment or to impress a resulting trust. However, as the trial progressed, this order was disregarded, and the court permitted the introduction of all testimony tending to establish a right to any form of equitable relief.

Plaintiff alleged in her second cause of action that the deed to her father, executed in June, 1922, was obtained through fraud and misrepresentation and without knowledge on her part of the purport of the instrument she signed.

A third cause of action stated in the complaint is not urged here or discussed in the briefs.

Admitting the plaintiff's interest in her mother's estate and that, in respect of this interest, the father occupied a trust relation to the daughter, the defendants set up five affirmative defenses: (1) That John Gunstone had accounted to his daughter and discharged the trust in fact, though no formal accounting was ever made in the guardianship proceedings; (2) that accord and settlement had been made between the daughter and father; (3) that plaintiff's claims are outlawed by the statute of limitations; (4) that plaintiff's action is barred for failure to comply with the statute of nonclaim in her father's estate; and (5) laches.

The trial court, without making findings of fact, quieted the title of the defendants to the land and

dismissed the plaintiff's action on the ground that she was barred by the statute of limitations, without prejudice, however, to her right to further action in respect of any specific property into the purchase of which she can trace trust funds. The plaintiff appeals.

The appellant first complains of the court's dismissal of her first cause of action as having been made upon the ground that she had failed to trace any of the trust funds into the purchase of specific property. While the court may have held this view, in the brief announcement of its decision it bases its action on the statute of limitations.

The appellant failed to establish a right to relief in respect of her first cause of action, first, because she did not establish the facts necessary to create a resulting trust; and, secondly, because, having failed to file a claim against the estate of John Gunstone, she was barred by the statute of nonclaim, if not otherwise barred by the statute of limitations.

She became of age in May, 1920. This action was instituted thirteen years thereafter. The courts are divided on the question of the running of the statute of limitations against the claim of a ward in cases of this kind. The English rule, followed by some American courts, seems to be that the trust relation is not affected by the ward's coming of age, while other American courts follow the rule that, when the ward becomes of legal age, the relation of debtor and creditor succeeds that of guardian and ward, and that the statute of limitations operates. *Sweet v. Lowry,* 123 Minn. 13, 142 N. W. 882, 47 L. R. A. (N. S.) 451.

But assuming, for the purpose of this case, that John Gunstone remained under a duty to account to his daughter for the trust funds in his possession, the appellant is barred by her failure to file a claim against his estate.

Rem. Rev. Stat., § 1484 [P. C. § 9835], provides:

"No holder of any claim against an estate shall maintain an action thereon, unless the claim shall have been first presented as herein provided."

Construing this statute, the court said, in *Davis v. Shepard,* 135 Wash. 124, 237 Pac. 21, 41 A. L. R. 163:

"Laws of 1917, ch. 156, p. 672, § 107 (§ 1477, Rem. Comp. Stat.) [P. C. § 9828]', provides that 'If a claim be not filed within the time aforesaid [six months after the date of the first publication of notice to creditors] it shall be barred.' This statute has been strictly construed and held that it applies to claims of every kind · and nature, both those established and those contingent, and under both intervention and non-intervention wills, and that a compliance with the statute is necessary in order for there to be a recovery, and that such compliance cannot be waived by an administrator or executor. *Barto v. Stewart,* 21 Wash. 605, 59 Pac. 480; *Griffin v. Warburton,* 23 Wash. 231, 62 Pac. 765; *Crowe & Co. v. Adkinson Construction Co.,* 67 Wash. 420,' 121 Pac. 841, Ann. .Cas. 1913D 273; *Ward v. Magaha,* 71 Wash. 679, 129 Pac. 395; *Butterworth v. Bredemeyer,* 89 Wash. 677, 155 Pac. 152; *Harvey v. Pocock,* 92 Wash. 625, 159 Pac. 771; *Empson v. Fortune,* 102 Wash. 16, 172 Pac. 873; *First Security & Loan Co. v. Englehart,* 107 Wash. 86, 181 Pac. 13; *Baumgartner v. Moffatt,* 113 Wash. 493, 194 Pac. 392; *Andrews v. Kelleher,* 124 Wash. 517, 214 Pac. 1056."

*In re Jordan's Estate,* 171 Wash. 624, 18 P. (2d) 855, the court says:

"No claim was ever filed by the appellant. If Mr. Jordan, during his lifetime, mingled the trust fund with his own, and after his death the trust money or property could not be identified in the hands of the executrix, the claim of appellant's wards should have been served on the executrix or her attorney of record and filed with the clerk of the court.

" 'Nor, generally, is it necessary to present a claim to specific trust funds which are capable of identification. It has even been held that a suit to trace a trust

from land to money through an estate in process of administration is not a suit upon a claim required to be presented to the administrator for allowance. But when a trustee during his lifetime mingled money of the cestui que trust with his own, and after his death neither the trust money nor property into which it was converted can be identified in the hands of the executor or administrator, the claim of the cestui que trust is one which must be presented to the personal representative for allowance.' 11 R. C. L., p. 194, § 213."

In the present case, the guardian commingled guardianship funds with his own. The appellant failed to trace the funds into specific property. It is not enough to say, as the appellant does, that John Gunstone must have profited by the use of trust funds, and that it is to be presumed property acquired was purchased with appellant's money. Failing to impress a trust, her action for an accounting was barred by the statute of nonclaim.

In her second cause of action, the appellant sought to establish her right to her mother's interest in the farm. Her right to this relief is, of course, foreclosed by her deed of June 15, 1922, unless, as she alleges, the deed, in the first instance, was procured by fraud or misrepresentation on the part of her father, and that she signed the instrument in ignorance of its contents and remained in ignorance of the true facts and her rights in the land for some twelve or thirteen years thereafter, or shortly before her suit was instituted.

The consideration recited in the deed is one dollar and love and affection. The respondents contend, however, that the appellant received from her father, at various times, in property and money, more than the value of her interest in her mother's estate. Witnesses testified to conversations had with the father, in which

he stated that he had given his daughter more than her mother's share; one witness testified to a conversation with the appellant, in the course of which she said that she had nothing coming from her mother's estate, because her father had given her property and money of the value of twenty-eight thousand dollars. On the other hand, witnesses testified, on behalf of the appellant, that John Gunstone had, on numerous occasions, expressed concern that he had not settled with his daughter for her interest in her mother's estate.

Much of this testimony was hearsay and of very little value. It is inferable from the record, however, that the father treated his daughter generously. If she had, in fact, received the equivalent of her interest in her mother's estate, it would account for the readiness with which she complied with her father's request to sign the deed.

As we have seen, appellant had had more than an average education. Mr. Gunstone was a man of very little education. He could sign his name and read figures, but was otherwise unable to write, and relied much on his daughter, before she left home, in the conduct of his business. He was engaged in farming, logging, and butchering, dealt in cattle, and was known as an active trader. From the time she was fourteen years of age, his daughter helped him in these affairs; wrote and cashed checks for him and was familiar with his business. For some time after her marriage she had conducted an art store, in Olympia, given to her by her father. Before executing the deed, she had married and lived with her husband and was free of her father's immediate influence.

Appellant testified that her father met her in Olympia, in front of a grocery store, and asked her to go to the office of the late P. M. Troy, his attorney, to sign some papers. She went there alone and signed

the deed in the presence of Mr. Troy's clerk—Mr. Troy was out of the office at the time. That she did not know the import of the instrument she signed, seems improbable, in view of her business training. It is also hard, in face of the record, to give credence to the claim that she was in ignorance of her right to an interest in her mother's property. On at least two occasions before executing the deed to her father she had joined in the execution of other conveyances of land belonging to the mother's estate. She had joined her father in signing a mortgage to secure a loan of ten thousand dollars, which contained a recital that:

"The mortgagor, Eunice Bell Walters, formerly Eunice Bell Gunstone, heir of Olive Gunstone, deceased, at Olympia, Washington, hereby mortgages her right, title and interest . . ."

It is true that the law looks with suspicion on conveyances between guardian and ward and parent and child, and courts are ready to set such conveyances aside on very slight evidence that advantage was taken of the relation of trust and confidence existing between the parties. But, assuming the deed to have been voidable in the first instance, should the appellant, after having remained silent for so long a period and until her father's mouth was closed by death, be now heard to question the transaction?

During the long term of years intervening between execution of the deed and Gunstone's death, the second wife, Flora, and John Gunstone devoted their joint efforts to the improvement of the farm. At the time of the death of the appellant's mother, the farm home of her parents was primitive and but little of the land was cleared for cultivation; later on, improvements were added and a large and comfortable house erected. Seeing all this, the appellant stood silent. In fact, she did not express any dissatisfaction or make any claim

until after the step-mother had married Elhard Christensen. Apart from the bar of the statute of limitations, there was here, we think, such laches as foreclosed the appellant from any claim to equitable relief.

It is to be borne in mind that, while the appellant made the charge, she failed to prove any fraud or misrepresentation on the part of her father. According to her own testimony, her father asked her to sign some papers left with his lawyer. She signed the instrument, as she said, thinking it was power of attorney or some other like instrument to enable him to carry on his business. The father made no representation of fact to induce her to sign the deed, so far as the record discloses. The instrument he asked her to sign spoke for itself, if she had read it. In the course of her testimony, she said that since she went to school she knew what a deed meant and would have known this was a deed if she had read it.

In the course of his opinion in *Hammond v. Hopkins,* 143 U. S. 224, 12 S. Ct. 418, Chief Justice Fuller quotes with approval from the opinion of the supreme court of the District of Columbia as follows:

" 'If the party, in view of all the facts of the case, has slept upon his rights, a court of chancery will not intervene; and in measuring laches there are two extremely important considerations always taken notice of by a court of chancery, which limit and narrow the measure of time which otherwise would be liberal. Where there has been no change of circumstances between the parties and no change with reference to the condition and value of the property, a court of chancery will run very nearly if not quite up to the measure of the statute of limitations as applied in analogous cases in a court of law. But where there has been a change of circumstances with reference to the parties and the property, and still more where death has intervened, so that the mouth of one party is closed, and those who represent his interests are not

in a predicament to avail of the explanations which he might have made, out of the charities of the law and in consideration of the fact that fraud is never to be presumed, but must always be proved and proved clearly, the courts limit very much, in such cases, the measure of time within which they will grant relief, because the presumption comes in aid of the dead man, that he has gone to his account with a clear conscience.' "

Speaking of the defense of want of knowledge on the part of one charged with laches, the supreme court of the United States, in *Foster v. Mansfield, C. & L. M. R. Co.,* 146 U. S. 88, 13 S. Ct. 28, says:

"The defence of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts."

The record in this case can lead to but one conclusion—that, if the appellant remained in ignorance of her right, it was attributable wholly to her own inexcusable neglect.

The judgment is affirmed.

Steinert, C. J., Main, Millard, and Blake, JJ., concur.