## WINDOW GLASS MACH. CO. et al. v. SMETHPORT WINDOW GLASS CO.

(District Court, W. D. Pennsylvania. May Term, 1917.)

No. 132.

1. Patents ⟜328—For covering receptacle in glass-drawing apparatus held valid and infringed.

Lubbers patents, Nos. 702,013, claims 1, 12, 17, 702,014, claims 1, 12, and 702,015, claims 1, 2, 5, 6, covering the construction of the receptacle for molten glass in apparatus for drawing glass cylinders, *held* valid and infringed by the construction of defendant's tank.

2. Patents ⟜328—For covering air control in drawing glass cylinders held valid and infringed.

Lubbers patents, Nos. 702,013, claims 4, 5, 702,014, claims 5, 6, 702,016, claim 2, 702,017, claim 7, 886,618, claims 1, 22–25, and 1,020,920, claims 3, 6, 7, 8, covering automatic regulation of the rate of air supply during the drawing of glass cylinders *held* valid and infringed.

3. Patents ⟜328—For covering variable speed of drawing of glass cylinders held valid and infringed.

Chambers patent, No. 762,880, claims 1, 2, and Lubbers, No. 822,678, claims 1–3, 5–8, covering the idea of gradually increasing the speed of the draw during the operation of drawing glass cylinders, *held* valid and infringed.

4. Patents ⟜328—914,588, claims 5–7, and 926,501, covering adjustment for surface tension in drawing glass cylinders, held valid and infringed.

Lubbers Patents, Nos. 914,588, claims 5–7, and 926,501, covering means for adjusting the point of drawing glass cylinders from the receptacle to compensate for variation of surface tension, *held* valid notwithstanding claimed anticipation, and infringed.

5. Patents ⟜112(3)—Prima facie valid.

Patent is prima facie evidence of its validity, and to overcome this presumption the burden rests on him who asserts want of novelty to prove it by clear and convincing evidence.

6. Patents ⟜72—Process patent can be anticipated only by another process.

A process patent can only be anticipated by a similar process, not by a prior apparatus similar to that used by patentee to effectuate his process.

7. Patents ⟜328—For covering apparatus for taking down drawn glass cylinders, held valid and infringed.

Patents Nos. 702,014, claims 8, 9, 890,306, claims 1–5, 1,073,613, claims 1–7, 13, 20–22, 1,102,803, claims 1, 4–6, and 1,176,505, all claims, except 6 and 7, covering the method and apparatus for taking down drawn glass cylinders after the drawing operation is completed, *held* valid and infringed.

8. Patents ⟜328—For covering spring horse for drawing glass cylinders held valid and infringed.

The Hitner patent, No. 821,361, and the Bridge patent, No. 1,006,995, claims 1, 2, 4, covering the spring horse with adjustable arms and apparatus for topping and capping drawn glass cylinders thereon, *held* valid and infringed.

9. Patents ⟜328—841,011, claims 3–5, covering inclosure for drawn glass cylinders, held valid, but not infringed.

Hart patent, No. 841,011, claims 3–5, for drawing glass cylinders within an inclosure, surrounding it with practically confined atmosphere, *held* valid, but not infringed, by a plate for another purpose which protected the cylinder from draft only from one direction.

In Equity. Suit for infringement of patents by the Window Glass Machine Company and another against the Smethport Window Glass Company. Decree ordered for complainants.

⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Bakewell & Byrnes, of Pittsburgh, Pa., for plaintiffs.

Marshall A. Christy, of Pittsburgh, Pa., Hood & Schley, of Indianapolis, Ind., and F. D. Gallup, of Smethport, Pa., for defendant.

THOMSON, District Judge. The burden resting on the court in this case, growing out of the numerous patents involved and the very voluminous records, has been greatly lightened by the decision of the Circuit Court of Appeals (261 Fed. 362) in the appeal from a decree of this court, in the case of these plaintiffs against the Consolidated Window Glass Company and others, as many of the patents there in suit, are involved here. In my opinion in the Consolidated Case, I gave a general description of the process of drawing glass cylinders by machinery from a receptacle of molten glass; the numerous and perplexing problems involved in the process; the large amount of money expended, and tireless experimental work required, extending over many years, before the art had reached that stage of advancement which made it commercially successful. These matters need not be repeated in this opinion. I there found that John H. Lubbers and his associates worked out the basic problems involved in the drawing of glass cylinders by machinery; that others before him had discovered important principles, and made ingenious experimental efforts in the field, but that to his genius and labors belongs the credit of creating this art and giving it life, resulting in the establishment of a great and useful industry.

Of the 18 patents in suit, 12 were in litigation in the Consolidated Case, namely: Lubbers patents, Nos. 702,013, 702,014, 702,015, 702,016, 702,017, 822,678, 886,618, 914,588, and 1,020,920; Chambers patent No. 762,880; Hitner patent, No. 821,361; and Bridge patent, No. 1,006,995. The claims of the several patents there in suit were sustained by the Circuit Court of Appeals, except Lubbers apparatus and method patents, Nos. 702,016 and 702,017, covering what is known as "pop valves" intended to allow the air to escape from the cylinder when the pressure rose above a determined limit. But, in addition, certain patents not involved in the Consolidated Case are in suit in this case, raising additional questions of validity and infringement. The validity of the respective claims in the various patents involved in the Consolidated Case having thus been established, the inquiry, so far as the same questions are raised here, has been very greatly narrowed.

In determining the question of validity and infringement, the claims can best be considered in groups as they relate to a particular process or patent:

[1] First, as to bath problems, patents, and claims: This group involves claims 1, 12, and 17 of patent No. 702,013, claims 1 and 12 of 702,014, and claims 1, 2, 5, and 6 of patent 702,015.

A description of the defendant's apparatus and practice was furnished by the defendant and offered in evidence by the plaintiffs. Plaintiffs' Exhibit No. 9, and one of plaintiffs' illustrative drawings, which are attached hereto, show the form of construction of the defendant's plant.

Plaintiffs' Exhibit No. 9, Perspective View of Defendant's Tank.

266 FEDERAL REPORTER

Illustrative Drawing of Defendant's Tank.

The melting end is somewhat narrower than the drawing end. Defendant, about 1913, rebuilt and widened the working end of its furnace to the present form; that is, with the side walls converging toward the front. In the arch adjacent to each side wall are four drawing openings, each being defined by depending mantel blocks with in-turned lower ends or toes, between which and the floating rings there is a gap of about one-half inch. This forms a substantially circular drawing opening, closely adjacent to the surface of the glass. These depending blocks are each supported by vertically adjustable hangers from a frame, which is itself vertically adjustable from a stationary frame. A floating clay block called the ring spider, has vertical slots, which receive lugs in the sides of the floating rings, and the latter, by rotation of the spider, are brought alternately from the furnace into alignment with the drawing opening. The spider is engaged by the lower end of a vertical shaft driven in either direction, the action of which is controlled by a lever at the blower's stand. While the drawing portions of the tank have the full depth of glass throughout, a reference to the drawings attached shows that the widening of the working end of the furnace brings the drawing stations outside of the tank proper; that is, to one side of the main flow of the hot currents of glass in the tank.

I think the clear purpose of this construction is, not only to get the drawing stations to one side of the main flow of hot currents, but is also an endeavor to equalize the temperature conditions throughout the length of the drawing end of the tank; the extensions being widest at the end nearest the main body of the tank, and gradually narrowing toward the nose end, where the heat decreases. The evidence shows that the mantel blocks or shades are provided for the express purpose of cutting off the heat of the furnace from the drawing point. Du Cheamp, who designed and installed defendant's apparatus, testifies that these mantel blocks, together with the floating ring, shield off the heat of the furnace sufficiently to allow the glass to set as the cylinder is drawn, and that this could not be satisfactorily done in the furnace as constructed, if the mantel blocks were removed.

It appears that defendant first started with a tank having the projecting doghouse form, or forehearth. Later this extension was pushed back into the tank in such a manner as to give a sheltered portion along the breast wall of the tank. To the drawing stations the glass flows continuously from the main body of the tank; the roof of the side portion is lower; by its position it is measurably protected from the main flow of hot currents, and is sheltered by depending shades, which coact with the floating rings, shutting off the intense heat of the furnace. This condition, in my opinion, is the fundamental equivalent of the Lubbers forehearth.

The validity of Lubbers patents Nos. 702,013, 702,014, and 702,015, having been upheld by the Circuit Court of Appeals in the Consolidated Case, I see nothing in any additional defense here urged to affect that finding. I find infringement of each of the forehearth drawing claims in suit in these three patents. Comparing defendant's apparatus with claim 1 of patent No. 702,013, we have a receptacle for molten glass, means for heating that portion of the body of the glass from

which the cylinder is drawn (burners projecting through the breast wall), a shield arranged to cut off the heat from the exterior of the cylinder adjacent to the drawing point, a bait having a fluid supply pipe connected thereto, and the connections for raising and lowering the bait.

These elements are combined substantially, and for the same purposes, as in patent No. 702,013. Defendant's apparatus has all the elements of claims 12 and 17 of this patent—the forehearth extensions, the drawing apparatus, means for heating the glass in such extensions, and the shielding means of claim 12. It has all the elements of the method claims of patent No. 702,014. Compared with claim 1, it draws a cylinder from a bath of molten glass, heats that portion of the body of the glass from which the cylinder is drawn, shields the cylinder from the heat, and supplies air to the interior of the cylinder during the drawing operation. It infringes claim 12 of this patent, as it draws a hollow article from a bath of molten glass, severs the lower end of the article from the bath by admitting heat currents to the lower portion, moves the article to one side, and severs its upper end from the drawing device. Defendant's cylinder is taken down with the drawing device attached, by a downward and lateral motion, and then severs the cap portion and bait from the cylinder.

Each of claims 1, 2, 5, and 6 of patent No. 702,015 are infringed. As in claim 1, there is a ring arranged to float upon the glass bath and a shield device arranged to form a sealing joint, with the ring above the level of the bath. It has also the depending shield of claim 2, as its mantel block depends from the overhead supports. Claim 5 is infringed, because its floating ring has holding devices for retaining it in position, the dovetailed engagement of its lug with the spider, and the shield and drawing apparatus are arranged to operate within the shield. Claim 6 is broader still, as it simply specifies that the shielding device and floating ring are arranged to coact. As in the Consolidated Case, I think the slight gap, perhaps half an inch, between the toes of the mantel blocks and the floating ring, is not material, as there is the clearest kind of co-operation between the parts, and in both the same result is sought and obtained.

Lubbers was careful not to be limited to any particular form of shield, as he states in the specifications of patent No. 702,013:

"I use the word 'shield' in the broad sense, to include any device for preventing the access of heat to the article being drawn."

The prior art relied upon against the forehearth patents and claims was considered and passed upon in the Consolidated Case, and I find nothing to alter my views therein expressed. I see little relevancy in the Danner patent, set up in this case. It relates to a different art, that of spinning a small glass tube horizontally from the point of a cone revolving at a high rate of speed. Nor do I deem relevant the evidence offered that some measure of success has been recently achieved in sheet drawing. It appears that this process has not as yet reached a very successful solution, and the improvement which has made this partial success possible was discovered long after the sheet-drawing patents, set up by the defendant, were issued.

[2] *Air Control*—Patent No. 702,013, claims 4 and 5; patent No. 702,014, claims 5 and 6:

Claims 4 and 5 of the first patent were not involved in the Consolidated Case, as there defendants did not use any means for automatic air control; a blower's hand valve being employed. They were involved, however, in the Okmulgee suit, and there held valid. The prior art does not disclose the automatic regulation of the air, as called for in claim 4, nor the connection of the controlling valve with a moving element for automatically actuating the valve during the draw, as called for by claim 5. The gradual increase of the air supply as the cylinder lengthens is an absolutely essential condition; and to do this automatically, to so proportion the movement of the valve with that of the drawing apparatus that the amount of air admitted at any given moment of the draw would depend upon the length of the cylinder then drawn, and so adjusted that any variation in speed would produce a corresponding variation in the air admitted, was certainly a novel and important inventive conception.

Claim 5 of patent No. 702,014 was involved in the Consolidated Case, and while this court did not sustain it, its validity was upheld by the Circuit Court of Appeals, which finding is controlling in this action.

While claim 6 was not involved in that case, it includes the automatic regulation of the rate of air supply, and is valid for the reasons applicable to claims 4 and 5 of patent No. 702,013.

Patent No. 702,016, claim 2; patent No. 702,017, claim 7:

As held by this court in the Consolidated Case, these claims were intended to cover only valve openings, were never put into practical use, and are inoperative. In this conclusion the appellate court concurred, and I so hold here.

Patent No. 886,618, claims 1 and 22 to 25, inclusive; patent No. 1,020,920, claims 3, 6, 7, and 8:

These are corresponding apparatus and process patents, covering the constantly open vent, as distinguished from the type of vent holes shown in the two previous patents. I held in the Consolidated Case that these claims covered a novel and very valuable invention, unknown to the prior art, which largely solved the mystery of the breathing or pulsating of the cylinder. This conclusion, to which I adhere, was concurred in by the appellate court.

I find that the foregoing claims of the above-named air control patents, which I have held valid, are infringed by the defendant. The latter not only increases the rate of air supply as the cylinder is drawn, but does so automatically by a graduating valve actuated by a connection with a moving part of the drawing apparatus. The vent is practically the plaintiffs' form of vent, in substantially the same location. It is manipulated by hand, being kept closed during the forming of the neck and cap, and open during the drawing of the cylinder, permitting the escape of air necessary to maintain the pressure sufficiently constant to prevent extreme pulsations.

[3] *Speed of Draw Patents and Claims*—Patent No. 762,880, claims 1 and 2; patent No. 822,678, claims 1, 2, 3, 5, 6, 7, and 8:

In the first of these patents, claim 1 covers the idea of gradually increasing the speed of the draw through the drawing operation;

claim 2 being generally similar, but limited to automatically increasing the speed. In the Consolidated Case, I held these claims invalid, in view of the prior art; but on appeal their validity was sustained by the Circuit Court of Appeals, and in harmony with that opinion I hold them valid here.

Patent No. 822,678 is known as the three-speed patent, as opposed to the gradual increase of speed described in the Chambers patent. This patent describes three distinct speeds, or classes of speed, during the draw; that is, a slow speed for forming the neck and cap, a higher speed for drawing the cylinder body, and a still higher speed to thin the glass for cutting off. These claims were sustained by the Consolidated Case, both in this court and in the appellate court, and there is nothing in the record of the present case to alter that conclusion. The claims are therefore sustained.

I also find infringement of the claims of these patents by the defendant. Plaintiff's testimony shows that in defendant's operation the neck and cap are drawn at a relatively low speed; that after the cap is formed the speed is increased, and again increased at intervals during the drawing of the body of the cylinder. This increasing speed is effected by hand-operated rheostats in the machines as now operated. At one time the defendant used a conical winding drum for hoisting the cable, giving the automatic increase of speed. The testimony shows that some of the defendant's winding drums were short, so that during the operation the cable wound back upon itself, giving a gradual speed increase.

[4] *Surface Tension Patents and Claims*—Patent No. 914,588, claims 5, 6, and 7; patent No. 926,501, all claims:

The three claims in the first of these patents were involved in the Consolidated Case, and were sustained by this court and the Circuit Court of Appeals. The essential novel step is adjusting the point of draw to compensate for the varying surface tension. Theoretically the temperature of the glass is uniform throughout the draw, but practically it is not. The result was the drawing of thick and thin glass, and the movement of the cylinder laterally across the bath. Lubbers solved this difficulty by initially adjusting the bait to one side of the bath, in the opposite direction from that in which the cylinder was traveling, thus neutralizing the traveling tendency and compensating for the varying heat conditions. The only specific means disclosed for such adjustment is slotted connections between the bait supports and the cage. This construction required that adjustments be made between draws.

Patent No. 926,501, not heretofore before the court, provides means whereby the adjustments can be made during the progress of the draw. Both the process and apparatus claims of the patent involve this feature. The evidence shows that there is an advantage in being able to make the adjustment during the draw, and the patent exhibits means for such adjustment by adjusting the bait through connections actuated from the drawing floor, or by adjusting the pot within the kiln.

The first four claims are process claims. Claim 1 covers, broadly, the step of adjusting the surface tension of the molten glass, from which the article is drawn, during the progress of the draw. Claim

2 specifies, in addition, that this is done "by adjusting the relative position of the glass containing vessel and the drawing bait." While differing in wording, claims 3 and 4 cover substantially the same step. The remaining are apparatus claims. Claim 5, for instance, covers a glass holding receptacle and drawing device, the parts being mounted for lateral adjustment, relative to each other, together with means to effect an adjustment without stopping the drawing motion. The other claims are generally similar, all being limited to means for adjustment during the drawing operation, wherein they differ from the prior Lubbers patent, No. 914,588.

As to patent No. 914,588, I see no reason to alter the conclusion reached in the Consolidated Case, as there appears in the prior art no anticipation of the invention, and I believe it to be a very valuable contribution to the art.

As against patent No. 926,501, it is claimed by defendant that the invention is that of Wadsworth, and not of Lubbers. The testimony on this matter is somewhat confusing and unsatisfactory. The substance of Mr. Wadsworth's testimony is that in January or February, 1906, he made certain sketches, which he produces, showing a construction in which either the entire kiln in which the pot was mounted, or its upper portion, could be moved in either one of two directions; that one or two of these machines were installed in the summer or fall of 1906, in the factory of the American Window Glass Company at New Castle, which factory was then being used for experimental purposes; that the installation was there used for two or three months, and the plant was no longer used; that later he designed eight machines, which were installed in Monongahela City, which he believes was in 1906; that later drawings were prepared for an application for patent, but no application was ever filed. The plaintiffs offered testimony that these machines were installed in the spring of 1907.

The following considerations lead me to the conclusion that the patent is valid:

[5] (1) The patent is prima facie evidence of its validity. The authorities hold that, to overcome this presumption, the burden of proving want of novelty rests upon him who asserts it, and every reasonable doubt should be resolved against him. The evidence must be exceptionally clear and convincing; as many authorities have said, it must be full, unequivocal, and convincing. Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821.

(2) The use at New Castle could hardly be set up as a public use, occurring more than two years before the application of this patent, because it was simply experimental; the plant during that period being used exclusively for experimental purposes. It would appear that the installation in Monongahela City was in 1907, within the two-year period.

(3) The specifications of patent No. 941,588 state:

"It will be understood that the relative adjustment between the bait and the pot may be obtained, either by adjusting the pot laterally in different positions or by adjusting the bait carrier."

To carry out the invention of this patent, if the pot, instead of the bait, is adjusted, means must of course be provided for adjusting it

in both directions. This patent, therefore, contains a disclosure of the broad idea of adjusting the pot in both directions, and Mr. Wadsworth, it is conceded, participated in the preparation of the application for this patent, in which that idea is disclosed.

(4) It is not claimed by Mr. Wadsworth that he invented surface tension adjustment broadly, and he admits that the idea of adjusting the bait off center in both directions was known to him before he made the sketches of the movable kiln.

(5) Whatever Mr. Wadsworth may have invented relating to the movable kiln, it was merely the idea of moving the entire kiln, or the upper portion thereof, instead of moving the pot within the kiln.

(6) There is no proof that the movable kiln was actually and successfully used for the purpose of making off-center adjustments during the draw. I do not understand Mr. Wadsworth as claiming to be the inventor of the idea of adjustment during the draw. There is no evidence that his apparatus was ever so used for any such purpose prior to the filing date of the Lubbers patent, No. 926,501.

[6] (7) Even if the defense could prevail as to the apparatus claims, it would fail as to the process claims, as a process patent can only be anticipated by a similar process.

(8) I do not find anticipation in the Guianotte or Healey patents, cited against the two surface tension patents in suit, under the evidence in the case. The former has relation to the drawing of sheets, where the problems of surface tension do not arise; while in Healy the pot is mounted on a turntable, the drawing apparatus being mounted on a frame, which in turn is mounted on a track, and there is no arrangement for moving the pot closer to the frame on the track, nor for carrying the blowing apparatus nearer to the pot. Mr. Wadsworth, on page 185 of the record, states:

"I do not want to be understood as implying Healey contemplated those movements. On the contrary, I did understand from the Healey specification, that he used these movements to center the line of draw on the pot, and not to throw it off center."

Owing to the unsatisfactory character of the evidence offered as to prior use, and for the reasons above set forth, I find the claims of this patent, No. 926,501, valid.

The defendant's apparatus appears to infringe the claims of both the surface tension patents. While defendant's testimony shows that the instructions were to nominally keep the pipe centered over the pot, this refers to normal conditions, and surface tension adjustments are to meet conditions which are not normal. The defendant's construction permits of adjustment, either between draws or during a draw. The floating rings are carried by the rotating spider, which is under control of the blower, who can, at any time, either between or during draws, shift the ring from which the draw is being made, to change the drawing point with respect to the inner walls of the ring. In the same manner, the workman in the Consolidated Case adjusted the rings with a hand implement.

It is not controverted that the pivoted elevator guide frame gives adjustment from front to back. It is true that one of the purposes

of this swinging guide frame is to enable the cylinder to swing forward away from the drawing station, preparatory to taking down. But the evidence shows that it is also used for the purpose of surface tension adjustments.

[7] *Take-Down Patents and Claims*—Patent No. 702,014, claims 8 and 9; patent No. 1,073,613, claims 1 to 7 inclusive, and claims 13, 20, 21, and 22; patent No. 890,306, claims 1 to 5, inclusive; patent No. 1,176,505, all claims, except 6 and 7; patent No. 1,102,803, claims 1, 4, 5, and 6:

Patent No. 702,014, claims 8 and 9:

In the Consolidated Case, these claims were held valid and infringed. Claim 8 is as follows:

> "The method of forming hollow glass articles, consisting of lowering a hollow bait into a bath of molten glass, drawing a hollow article from the bath, supplying a gaseous fluid to the interior of the article during drawing, severing the lower end of the article from the bath, moving the drawing device, with the hollow bait and article suspended therefrom, to one side of the bath, lowering the article into horizontal position while at' ched to the drawing device, and then severing the article from the bait, substantially as described."

Claim 9 adds the features of forming the neck and cap, and then expanding the size of the cylinder in successive steps. The novel feature of these claims consists in detaching the blowpipe from the lifting frame, and the simultaneous swinging out and lowering of the cylinder with the pipe attached thereto.

There appears no description in the prior art of any method of taking down a cylinder drawn from a molten bath. The Coburn patent, for drawing sheets, cited by the defendant, appears to have little or no relevancy. Wherever the prior art describes taking down a glass cylinder, it is stated that the cylinder is cut from the bait before taking down. The Lubbers method, at first thought, would appear impracticable. Certainly it is far from obvious that a large, fragile cylinder, with its well-known strains, could be successfully lowered into a horizontal position while still attached to the heavy blowpipe. The conception was new, and a valuable addition to the art. The claims appear, also, to be infringed. The defendant "moves the drawing device, with the hollow bait and article suspended therefrom, to one side of the bath," before lowering as recited in claims 8 and 9. In the Consolidated Case, the movement to one side was a part of the lowering movement. In this, the steps are separate, although there is the same additional lateral movement during the taking down as in the Consolidated Case.

Maynard patent No. 1,073,613, claims 1 to 7 inclusive, and 13, 20, 21, and 22:

In the Okmulgee Case, these claims were adjudged valid and infringed. They were all in suit in the Brookville Case, except claim 13. It appears that this was the first mechanical take-down devised in the art. As an example, claim 2 reads as follows:

> "In glass-drawing apparatus, a glass-holding receptacle, mechanism arranged to draw glass intermittently therefrom, and having a removable bait, a track or support extending to a point adjacent to the drawing path, and a

take-down device movable on said support and arranged to engage the glass article below the bait."

This broad claim includes the following elements: First, a glass drawing pot or receptacle; second, mechanism arranged to draw the glass intermittently therefrom and having a removable bait; third, a track or support extending to a point adjacent to the drawing path; fourth, a ·take-down device movable on this track or support and arranged to engage the cylinder below the bait. The novelty of this combination consists in the latter combined elements, including the track or support extending to the drawing path, and the take-down device movable on the track and carrying the article as a part of it.

Before this invention, the cylinder was lowered by hand, involving heavy physical labor in carrying the entire cylinder and bait, with much attendant risk to the workmen in case the cylinder should break. Claim 3 includes in combination, in a glass-drawing apparatus, a pot or receptacle, glass-drawing mechanism, a horse to receive the glass article, "and a take-down apparatus movable between the drawing apparatus and the horse." Claim 4 also includes the fact that the take-down apparatus is arranged to tilt the glass and deposit it on the horse.

Numerous patents are cited by the defendant by way of anticipation. The Pease patent, No. 463,644, shows no take-down apparatus, but a mere trolley to carry the drawn article to one side. No arrangement is shown for taking the article down. The Shaffer patent provides for laying the cylinder on a horizontal tray. There is no take-down, as the article is not suspended in the air. In the Colburn patents, there is a trolley for carrying the suspended sheet while hanging down, but no take-down apparatus. The same is true of the Guianotte patent. The Forster patent does not show the combinations of the Maynard claims. There is no horse, or horizontal support, separate from the frame, and the frame is not a "take-down apparatus movable between the drawing apparatus and the horse." The Forster frame is to swing the cylinder away from the drawing mechanism and then bring it to a position where the men can take it out of the frame, and there is no co-operation between his frame and the cage or lowering device for the cylinder.

As to claims 2, 5, 6, 7, and 22, which include the track extending between the drawing apparatus and the horse, this element is entirely lacking in the Forster patent.

On behalf of the defendant, there is an effort to prove priority of invention by R. L. Frink. In this, I think, it has failed. From all the testimony I find that Maynard was the first to·conceive the idea, the first to make drawings and a model, and the first to construct or reduce the invention to practice by filing his application. The authorities hold that the filing of an allowable application is a *constructive* reduction to practice, equivalent in law to an *actual* reduction to practice. This shifts upon the defendant the burden of proving, by specific evidence, priority of conception or invention by Frink, and I do not think it has met this burden. Nor do I think the defendant has established the inoperativeness of the Maynard device, in view of

the testimony and illustrations and models given by Mr. Maynard before the court in the Brookville Case.

On the whole, I sustain the validity of the claims in suit. I also find infringement by the defendant of all the claims in suit, except claim 22. Taking claim 2 as an example, defendant has the same glass-holding receptacle; that is, a pot. It has mechanism arranged to draw glass intermittently therefrom, and it uses a removable bait, which may be taken off the cage. It is hung on forks, as Maynard shows. It has a track or support, consisting of the overhead cable, which extends to a point adjacent to the drawing path. It has a take-down device movable on this cable, consisting of the trolley and gripper or hoop suspended therefrom, which is engaged with the lower portion of the cylinder, and is therefore "arranged to engage the glass article below the bait." The elements recited appear to be the same, co-operating in the same general way to attain the same result.

Claim 3 is broader than claim 2, as the track is not included. It includes, however, in addition to the pot and drawing mechanism, two additional features, the horse or support and the take-down apparatus, movable between the drawing apparatus and the horse, which defendant has. Claim 4 has, additionally, that the take-down apparatus tilts the glass during the operation. This tilting takes place in defendant's system. Claim 5 appears clearly infringed. As to claims 6 and 7, the testimony shows that defendant's overhead cable does not and cannot extend in a straight line. Any such cable between two fixed points will certainly hang down in its middle portion, and therefore defendant's track is downwardly inclined, as it leads away from the drawing position. The evidence is that, in the defendant's take-down operation, one man is used to prevent the cylinder running down the incline too fast, as the trolley moves toward the central portion of the overhead cable track. Claim 13 is infringed, as defendant has a bait and bait tube, a track, and a carriage with means (the loop) for supporting the cylinder, and means for simultaneously moving the bait and carriage during the lowering of the cage. Defendant's device appears to have all the elements of claims 20 and 21, including grippers to engage the article, these grippers being of any desired shape or form, in the defendant's case, a loop. Claim 22 calls for a connection between the carriage and the drawing device. This is for the purpose of having the carriage move at the same rate of speed as the drawing device, operating simultaneously with it. I do not find any such connection in defendant's construction, and conclude that this claim is not infringed.

Schmertz patent No. 890,306, claims 1 to 5, inclusive:

Maynard invented his take-down device in 1904, filing his application in 1905. Schmertz, one of plaintiffs' superintendents, made an improvement on the Maynard take-down, filing his application on March 20, 1906. This was a highly practicable and valuable device, and has been continuously used by the plaintiffs from the time of its invention. The special improvement over Maynard is in the use of a flexible overhead track, as distinguished from Maynard's rigid track. Schmertz was the first to conceive that the use of a flexible cable, sup-

porting the cable trolley, would accommodate itself to the movements of the cylinder, greatly reducing breakage. The file history shows that five of the six claims were rejected on the Brooks patent for a hay carrier. The claims were then amended to include in the combination the vertically movable bait cage of the drawing apparatus, creating thus a direct co-operation between the bait carrier and the take-down device on the cage. As so amended, the claims were allowed.

As against this patent there appears no prior art. The use of the flexible track cable, to support the take-down, was new. There was some effort made to show that Schmertz was not the inventor, but such claim is not supported by the weight of the evidence. It appears, from the early experiments of Lubbers in Allegheny in 1895 to the date of the Schmertz invention, plaintiffs in all their factories took their cylinders down by hand, according to the method claims 8 and 9 of patent No. 702,014. Frink and Maynard were working on the problem, but it appears that up to the time of the Schmertz invention no mechanical take-down was put into actual operation. Schmertz improved on Maynard, embodying with the idea of a taking-down carriage movable on the track, extending back from the drawing machine, a flexible cable in place of the rigid track, which would let the cylinder down gently, and thus reduce breakage. Though subsequent to Maynard, by this improvement he first reduced a take-down to actual practice, and with slight improvements it has become the plaintiffs' standard take-down. Maynard appears to be the first to have conceived any form of take-down; Schmertz the first to conceive and construct a commercial form of take-down embracing the broad principles of Maynard, to which he added the valuable improvement of the flexible track.

In this patent two methods of controlling the take-down cable are disclosed. In one, the take-down cable is attached to a lever which can be moved to vary the length of the cable between its supporting points. In the other, the cable is shortened by winding drums. It appears that the idea of the winding drum originated with Hunt. This, however, was but a detail of the improvement, and does not deprive the inventor of the perfected improvement. As in Maynard's system, after the take-down cradle or arm is applied to the lower part of the cylinder, the latter is moved out, and then the drawing cage is lowered. As the cage lowers, the trolley is moved out on the track; the bait end being supported and guided by one or more men. To lower the cylinder on the horse, Schmertz preferred to slack away on the overhead cable, allowing the gripper to lower the cylinder on the horse. This slacking away may be carried out by the winding drum, controlled by an electric motor, or can be controlled by the swinging lever.

The first four claims are limited to this idea of slacking away the track cable to lower. For instance, claim 4 recites, as the last element, "mechanism for slacking away the cable between the fixed points." Claim 5 is broader, reading as follows:

"5. The combination, with glass-drawing apparatus having a vertically movable bait cage, an operating station, a cable having a taking down device, and mechanism at the station arranged to control the bait cage and the cable take-down device, substantially as described."

The overhead track is the cable, and the take-down device is the trolley movable on the carrier, and carrying the cradle or gripper. The mechanism at the station, arranged to control the bait cage and the cable take-down device, may either be the control which the blower has over the bait cage by the hoisting mechanism, or, as in the case of the present defendant, the motor which controls the trolley on which the cable is wound.

I find infringement of the five claims in suit. Defendant's take-down co-operates with the drawing apparatus, and comprises a cable extending between fixed points, a gripping device mounted on the cable, which is the loop surrounding the end of the cylinder, and the mechanism for changing the length of the cable between the fixed points; that is, the winding drum and its motor. It has also the cable fastened at one end at a fixed point and extending over a pulley to a movable member, and a gripping device mounted on the cable between the fixed points, as in claim 2. Claim 3 is generally similar to claim 2, and its elements are present in defendant's apparatus. The latter comprises also the flexible cable, the gripping device on the cable, and the mechanism for slacking away the cable between the fixed points, as called for by claim 4. It infringes claim 5, which is broader than the other claims, as it has mechanism at the station arranged to control both the bait cage and the cable take-down device. The word "gripper" is a broad term to cover any device engaging or supporting the cylinder. In the patent of Maynard, it consisted of curved forks. In defendant's apparatus, it is a flexible band surrounding the cylinder.

Wells patent No. 1,176,505, claims 1, 2, 3, 4, and 5:

This patent appears for the first time in the litigation over machine-drawn glass cylinders. I do not find any successful citation against it from the prior art. Some evidence was offered as to its inoperativeness, chiefly on the ground that the cable, 2, as shown in the drawings, is not long enough to let the blowpipe down to the fully horizontal position. The exact length of the cable might depend on a number of things, among others, the height of the draw when installed for practical operation. But it is not the function of patent specifications to correctly show exact proportions. The testimony of Clark is that he installed the Wells take-down in most of the factories abroad, and that with slight adjustment in the length of the cable the drawings of the patent show a completely operative device. In the Schmertz take-down, a practically successful apparatus, as the cylinder approaches the horizontal position, it then required that workmen should take hold of the blowpipe and lift it out of its supports on the drawing cage, guiding this end down onto the horse. Wells does this automatically, stating in his specification as follows:

"The object of the invention is to automatically detach the blowpipe from the elevator cage at the desired moment, and to relieve the workmen from supporting the neck or blowpipe end of the heavy cylinder during lowering onto the horse."

The take-down cable is provided with an extension over guiding pulleys, and provided with a counterweight at its free end. An auxiliary trolley travels on this extension, which has a connection to be

Plaintiffs' Exhibit No. 11, Defendant's Apparatus.

snapped into an eye on the blowpipe. During the draw this auxiliary trolley is engaged with the blowpipe, and carried upward with the lengthening cylinder, and comes into action automatically when the operation of taking down the cylinder commences. When this trolley gets near the point where the guide ropes are provided, the weight of the cylinder acts to pull the blowpipe off the forks on the cage. The weight of the cylinder is then supported wholly by this additional trolley; the operator simply guiding it during the further lowering. This device is in use in the plaintiffs' factories.

Claim 1 covers take-down apparatus having a supporting device for supporting the blowpipe end of the cylinder, after the blowpipe is disengaged from the drawing cage. This is the auxiliary trolley referred to. The claim also covers, in combination therewith, another separate supporting device, which engages the lower portion of the cylinder after the drawing operation is completed. This is the gripper of the Schmertz take-down. Claim 2 is a little more specific than claim 1, specifying that the first-named supporting device is a "traveling carriage." Claim 3 includes the fact that the auxiliary trolley is "arranged to travel upwardly with the cylinder on the flexible connection during the drawing, and to support the blowpipe end of the cylinder during the take-down operation." Claim 4 specifies that the traveling connection has "means for supporting and guiding the blowpipe end of the cylinder," together with guide means "on which it may be moved upwardly with the cylinder during the drawing operation." Claim 5 is still more specific in providing that there is a traveling carrier for supporting the blowpipe end of the cylinder, "having means for engagement with and adapted to be carried by the blowpipe, or bait, to which the cylinder is attached."

I find these claims to be infringed by the defendant's apparatus. The cut attached to this opinion shows the auxiliary trolley arranged to travel on the upwardly extending portion of the main take-down cable and having a connection which is arranged to hook into the bait. The defendant, instead of using a counterweight, provides this auxiliary trolley with another guiding rope extending to an overhead support. As stated on page 5 of the description of defendant's apparatus forming part of plaintiffs' Exhibit No. 4, this bait supporting hook is attached to the bait after the bait has risen four or five feet from the bath, and then rises freely with the bait to its upper limit. The description also states that, as the cylinder comes down, the bait supporting cable—

"has been sufficiently doubled upon itself to cause the bait hook to take the weight of the bait and of the cylinder, and the cylinder moves outwardly toward and above the horse and is deposited upon the horse."

It thus appears that defendant's auxiliary trolley operates in the same way to effect the automatic detachment of the bait from the drawing cage, and is also attached to the bait and is carried upwardly therewith, as in the Wells patent. The slightly different arrangement of the auxiliary rope I do not deem material. The counterweight is included in claim 6, and for that reason that claim is not infringed. The

defendant does not employ the elastic element *14* in the auxiliary trolley connection, and for that reason does not infringe claim 7.

Roadman & Dravo patent, No. 1,102,803, claims 1, 4, 5, and 6:

This is a patent for a mechanical device relating to an improved construction of a take-down sling for use in connection with the Schwartz and Wells take-down apparatus. Schwartz grasped the cylinder with a device shaped like ice tongs, which were used for a considerable time. This patentee sought to provide a more convenient device in the nature of a hook or strap, having a separable connection at its ends, and adapted to be passed around the lower end of the cylinder, and having a flexible connection, such as a chain, leading to the trolley which travels on the main take-down cable. If the patent is valid, there is infringement. The real question is whether the improvement is the result of mere mechanical skill, or involves the higher quality of invention. This is in harmony with the view as expressed by defendant's counsel in their brief, wherein they say:

"If this patent is valid, it has been infringed by the defendant."

Defendant has set up some patents from the prior art against this patent. Patent No. 368,136 is for a cable hanger for supporting aerial cables, such as telephone cables, showing a slotted strap or band having means for connection with a suspended hook. There is no separability, except such as might be afforded by unbending the metal connection of the parts. The device lacks rigidity in the longitudinal direction, which feature is in all the claims in suit, and the device I think would be useless for handling glass cylinders. The Valles patent seems to entirely lack the essential features of the claims of the Roadman & Dravo patent. The Nate patent is for a cable hanger, consisting of a hook block, to which are attached two wires adapted to be passed around and support the cable. It would be valueless for the purposes for which the patent in suit is used. The Reese patent is a supporting device for metal dipping ladle, consisting of a rigid sleeve, which is secured between collars on the handles of the dipping ladle. Its ends are not separable, and it has no nonmetallic lining. Douchamp alleged the use of a supporting hook or strap by the defendant company in the fall of 1908, when that company first commenced to draw cylinders. But Roadman testifies that his invention was made and in actual use at Monongahela in April, 1908, and that these loops were made at Monongahela City and sent to the different factories of the defendant in the latter part of April or the beginning of May, 1908. Holliday testifies that he first saw this device at Bellevernon in 1908, and that after seeing that loop he made a similar one for use at Arnold, which he says was exactly the same as the ones he saw at Bellevernon in May, 1908. It would therefore appear that Roadman and Dravo had their device in actual use some time before the date alleged by Douchamp.

The United States Patent Office, presumably after careful consideration, issued this patent, thereby declaring that invention was involved in the production of a structure defined by the claims of the patent. The structure is simple, but it appears to be new and useful,

and so well adapted for the purpose that it has come into general use by the plaintiffs. I am not prepared to say that it is the result of mere mechanical skill. It seems to involve invention. The claims are therefore held valid and infringed.

[8] Bridge patent, No. 1,006,995, claims 1, 2, and 4:

The Bridge patent is for a spring horse upon which the cylinder is lowered for capping off into roller lengths. This patent was before the court in the Consolidated Case, and the claims held valid and infringed. This finding, although contested, was sustained by the Circuit Court of Appeals. The defense relied on is two years' public use. The evidence here is not materially different from the evidence in that case, and I am not convinced that the court erred in sustaining the validity of the patent. The essential feature of the patent lies in providing pairs of arms so arranged that, after severing, each roller length will be supported on at least two arms. Each arm is separately spring-mounted, having an independent yielding movement to accommodate any irregularities in the cylinder. The defendant's horse is substantially the same as that of the patent, having the series of supports arranged in pairs, each being independent, and so held that it yields independently to accommodate the particular shape of that portion of the cylinder with which it contacts. Claims 1, 2, and 4 are therefore held valid and infringed.

Hitner patent, No. 821,361, all claims:

In the Consolidated Case, the court sustained the defense of two years' public use, holding the patent invalid. This finding was reversed by the appellate court, which held the patent valid and infringed. In accordance with that opinion, I find the claims of this patent valid. By the Hitner device, when the cylinder is lowered upon the horse, it is cut into roller lengths by an electrically heated wire. This is a hand tool, with a small metal wire of high electrical resistance, sufficiently long to encircle the cylinder. There is a switch on the handle, by means of which the current can be turned on or off. The operator loops the wire around the cylinder, its free end being pressed around a roller held by the finger of the operator. The current, when applied, quickly heats the encircling wire, and a narrow ring of glass is expanded by the heat, and, when tapped by a cold steel tool, the glass parts on the line of the wire. The patent being valid, there seems to be no doubt that defendant's device embodies every element of these claims, accomplishing the same result in substantially the same way. The claims of the patent are therefore found valid and infringed.

[9] Hart patent No. 841,011:

This patent is involved in the Brookville suit, on which there is, as yet, no decision. The claims relate to drawing a cylinder upwardly within an inclosure which surrounds it with a practically confined atmosphere. The idea is to shut off drafts of air, and thus prevent breakage. The only relevant claims are 3, 4, and 5 of this patent. These claims are as follows:

"3. The method of forming hollow glass articles, consisting in drawing the article upwardly within an inclosure arranged to surround the articles with a practically confined atmosphere throughout their length, and supplying air to the interior of the articles during drawing, substantially as described.

"4. The method of forming hollow glass articles, consisting in drawing them forwardly within an inclosed atmosphere extending substantially the full length of the articles, and thereby protecting them from external influences, substantially as described.

"5. The method of forming hollow articles, consisting in drawing the article upwardly within a partial inclosure extending substantially the full length of the articles, and arranged to surround the same by a quiescent atmosphere, allowing access to the drawing during drawing, and then removing the article laterally from the inclosure, substantially as described."

The defendant refers, with much show of reason, to the use of the shields in the drawing of window glass, to Lubbers patent No. 762,274, dated August 2, 1904. This patent shows a chamber placed above the drawing bath and extending the full length of the sheet being drawn, which completely envelopes the sheet, and which communicates with an inclosed annealing chamber into which the sheet is carried laterally from the enclosing chamber. Thus Lubbers had the full conception of the matter of protecting from drafts during the drawing of the sheet in the earliest patent application which he filed. When Lubbers had found that when he drew sheets they must be drawn up within a surrounding chamber, as otherwise they would crack or break, it would seem exceedingly doubtful whether the idea of *partially* inclosing a window glass cylinder while being drawn, to prevent breaking, could involve invention. But the patent being prima facie evidence of invention, and the problem of cylinder and sheet drawing being different in many particulars, I am not prepared to find that these claims are invalid for want of invention; but I do not find infringement by the defendant, under the evidence offered in the case.

Defendant's drawing frame does not extend substantially throughout the length of the cylinder, as called for by each of the claims 3, 4, and 5 in issue. That each of these claims must be limited to a structure conforming to those requirements is evidenced by the file wrapper of the application for the Hart patent. Claim 3 of the original claims called for "drawing the article upwardly within an inclosure"; claim 4, "drawing them forwardly within an inclosed atmosphere"; claim 5 "drawing the article upwardly within a partial inclosure." After numerous rejections of the application by the Patent Office, an amendment was made, wherein there were inserted into these claims the following limitations: Into claim 3 the phrase, "arranged to surround the articles with a practically stagnant atmosphere throughout their length;" into claim 4, "extending substantially the full length of the article;" and into claim 5, "extending substantially the full length of the article and arranged to surround the same by a quiescent atmosphere." It is, of course, true that, these limitations having been inserted into the three claims by the plaintiffs in order to secure the patent, they cannot now be construed in disregard of those limitations.

I shall not stop to review at length the conflicting testimony bearing upon the character of the defendant's shield. After hearing the testimony, and reviewing it for the purpose of this opinion, I am satisfied that defendant's arrangement is as follows: To the back of its drawing frame is fixed an iron plate, terminating at its lower edge about

4 feet above the surface of the glass bath and in height about 14 feet. But the real purpose of this shield is to prevent broken glass from falling into the bath in case the cylinder should break, or should break away from the bait, when the lower end of the drawing frame is swung over the breast wall of the furnace preliminary to taking down the cylinder. To aid in performing this function, the lower portion of this back plate is somewhat rounded on its opposite edges, to form a kind of chute; that this plate is at the back of the cylinder, and that the cylinder is uninclosed on its opposite sides. The testimony of several witnesses is to the effect that, when standing on one side of the cylinder being drawn, the entire cylinder can be seen. Defendant's structure does not have, as in claim 3, an inclosure arranged to surround the articles with a practically confined atmosphere throughout their length; nor, as in claim 4, an inclosed atmosphere extending substantially the full length of the articles; nor, as in claim 5, is the article drawn upwardly within a partial inclosure extending substantially the full length of the articles, arranged to surround the same by a quiescent atmosphere. From the whole testimony, I think the plaintiff has failed to sustain the burden of proof of infringement which rests upon it; but, on the contrary, that the weight of the evidence establishes that the patent has not been infringed.

A decree may be drawn in accordance with this opinion.