# FOSTER *v.* MANSFIELD, COLDWATER AND LAKE MICHIGAN RAILROAD COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

No. 25. Argued and submitted November 2, 1892. — Decided November 14, 1892.

If a bill to set aside a foreclosure sale of a railroad under a mortgage, on the ground of fraud and collusion, be not filed until ten years after the sale, a presumption of laches arises which it is incumbent on the plaintiff to rebut.

The tendency of the courts is, in such cases, to hold the plaintiff to a rigid compliance with the law, which demands not only that he should have been ignorant of the fraud, but should have used reasonable diligence to inform himself of all the facts; and especially is this the case where the

subject of the fraud is a railroad, and the plaintiff is a holder of its stock and a resident of the neighborhood in which the fraud is alleged to have taken place.

No negligence is imputable in such case to a person who is ignorant of his interest in the property which is the subject of the alleged fraud; but if he is aware of his interest, and knows that proceedings are pending, the result of which may be prejudicial to them, he is bound to look into such proceedings so far as to see that no action is taken to his detriment.

In such a suit to set aside a foreclosure sale of a railroad, if the plaintiff does not show at least a probability of a personal advantage to himself by its being done, it is a circumstance against him, as a court of equity is not called upon to do a vain thing.

In such a case if it appear that the parties really in interest are content that the decree stand, it should not be set aside at the suit of one who could not possibly obtain a benefit from such action.

Ten years after the foreclosure and sale of a railroad, F. who was a stockholder, and resident in the vicinity, and who had, or might have had, access to all the proceedings in the foreclosure suit, filed a bill to set aside the foreclosure and sale upon the ground of collusion and fraud. The alleged acts of collusion and fraud were patent on the face of the proceedings. The property was incumbered, and it did not appear, from the pleadings, nor was there any probability from the facts stated, that any benefit would result to the plaintiff from setting aside the sale. *Held,*

    (1) That F. had been guilty of laches and that the suit was brought too late;

    (2) That the court would not entertain a bill to vindicate an abstract principle of justice, or to compel the defendants to buy their peace.

THIS was a bill in equity by a stockholder of the Mansfield, Coldwater and Lake Michigan Railroad Company to open the foreclosure of a mortgage upon its road executed to George W. Cass and Thomas A. Scott, trustees, and to vacate the order of sale and all proceedings thereunder, upon the ground of fraud and collusion, and for a receiver and injunction.

The bill purported to be filed for the benefit of the plaintiff and all other stockholders of the defendant company, and, after averring a written request to the directors and chief officers of the company to commence this suit, and the neglect and refusal of such directors so to do, set forth that the plaintiff was and had been since the transactions set forth in the bill the owner of 258 shares of the capital stock of the defendant company; that the suit was not collusive; and that, until

within a few months prior to the filing of this bill, he was ignorant of the fraud charged.

The bill further averred that in June, 1871, the Mansfield, Coldwater and Lake Michigan Railroad Company was incorporated under the laws of Michigan and Ohio, for the construction of a line of road from the city of Mansfield, in Ohio, to the town of Allegan, in Michigan, with an authorized capital stock of $4,000,000; that it began the construction of its road on such line, and, in order to obtain the money necessary for its completion and equipment, on October 1, 1871, executed a mortgage to George W. Cass and Thomas A. Scott, trustees, in the sum of $4,460,000; that on July 20, 1871, the defendant, hereinafter designated as " The Coldwater Company," entered into a contract with the Pennsylvania Company, also made a defendant to this bill, by which the latter bound itself to provide the necessary iron, etc., and to equip and operate the whole line as a first-class road.  In consideration of these obligations the Coldwater Company agreed that its preferred stock should be issued to the amount of the actual expenditures made by the Pennsylvania Company in doing the work aforesaid, said stock to be entitled to dividends equal to seven per cent out of the net earnings of said road, with the further agreement to deliver to the Pennsylvania Company bonds to the amount of $20,000 per mile of track laid, and common stock to an amount $5000 greater than the whole amount of stock issued for all other purposes, said bonds and stock to be delivered to Cass and Scott, trustees, for delivery to the Pennsylvania Company, as fast as material should be delivered by said company to the value thereof, and in full as each ten miles of iron should be laid, and the track put in running condition.  That afterwards, and on May 4, 1872, the Coldwater Company entered into another contract with the Pennsylvania Company, by which it delivered to the latter all of its bonds of the par value as above stated of $4,460,000, whereupon the Pennsylvania Company, by its president, the said Scott, agreed that, in consideration of the delivery of such bonds before the iron was laid, and the other conditions performed, the Pennsylvania Company bound itself to take care of and pay all

interest coupons which might become due thereon prior to the completion of said line of railway for traffic, and that for all interest so paid and not justly chargeable thereto, under the contract of July 20, 1871, the Pennsylvania Company should be reimbursed out of the earnings of said road, after the same should be completed in sections under said contract, and begin to make earnings on the respective sections. The bill further averred that all of said bonds remained in the possession and under the control of the Pennsylvania Company from the time of their delivery as agreed until the sale of the railroad under the decree of the court; that on May 1, 1872, the Pennsylvania Company wrongfully obtained $1,500,000 of the common stock of the Coldwater Company, claiming to be entitled thereto under the contract of July 20, 1871; and that, after obtaining the same, it managed and controlled the affairs of the Coldwater Company, and thereby secured a majority of the members of its board of directors, and absolutely influenced and controlled all its corporate acts. That when it was given said capital stock it had in no way complied with its undertakings hereinbefore mentioned, nor had it earned the same, nor in any way become entitled thereto, but on the contrary had entirely failed to perform upon its part its undertaking of July 20, 1871; that it finished no portion of said road as therein provided, and in no way earned an ownership in the bonds and capital stock aforesaid. That on January 20, 1876, the said Cass and Scott, trustees, filed a bill for the foreclosure of the mortgage, averring the insolvency of the Coldwater Company, and its failure to pay the interest on its bonds; that on April 17, 1876, the defendant company filed its answer denying each material allegation of the bill, and setting up a full and complete defence; that on January 3, 1877, the Coldwater Company withdrew its appearance and answer, and on March 21, suffered an order *pro confesso* to be entered against it, in pursuance of which a decree of foreclosure and an order of sale was made, and the property was sold August 8, 1877, to Joseph Lessley in trust for the Pennsylvania Company for the sum of $500,000; that all of the proceeds of such sale were applied to the payment of the bonds held by the Pennsylvania

Company, and no portion came to the Coldwater Company, or was applied to the payment of its debts or liabilities.

The gravamen of the bill was that, at the time of the execution of the mortgage, the said Thomas A. Scott, trustee thereunder, was president of the Pennsylvania Company and its chief executive officer; that George W. Cass, co-trustee, had full knowledge of the relations of said Scott to the Pennsylvania Company, and of his aims and motives, and conspired with him in forwarding the interests of the Pennsylvania Company to the detriment of the Coldwater Company. That J. Twing Brooks, who was also made a defendant to this bill, was a director of the Coldwater Company, and was also general attorney for the Pennsylvania Company, and legal counsellor and adviser of Cass and Scott, and as their solicitor brought the suit to foreclose the mortgage, and in all of their acts these parties were moved by, and acted wholly in, the interest of the Pennsylvania Company, and in violation of their obligations to the Coldwater Company. That Reuben F. Smith, George W. Layng, and Frank Janes, who were also made defendants, were directors of the Coldwater Company, and were also, at the same time, employés of the Pennsylvania Company, and were made directors of the Coldwater Company at the instigation of Scott, for the sole purpose of carrying out the plans and schemes of the Pennsylvania Company. That Cass and Scott, as trustees, prosecuted the foreclosure suit in the interest of the Pennsylvania Company, to destroy so much of the road of the Coldwater Company as lay west of Tiffin, in Ohio, and to sink and destroy its stock; and that the interests of said trustees and said Pennsylvania Company and of the holders of said bonds were one and identical. That, by the terms of the agreement of May 4, 1872, the Pennsylvania Company was bound to pay the interest matured upon the bonds, and the subsequently accruing interest thereon, until the completion of the road, under the agreement of July 20, 1871; and that the allegations of the foreclosure bill, that the interest upon the bonds was overdue and unpaid, and that the Coldwater Company was insolvent, were untrue, and were known to be untrue by said trustees and the defendant Brooks.

. It was further averred that the existence of the contract of May 4, 1872, was, at the time of the withdrawal of the appearance and answer of the Coldwater Company, and the entering of the decree, purposely concealed from the court and from the stockholders of the company, as a part of the conspiracy and fraud. That the defence to the foreclosure suit was withdrawn in pursuance of the collusive action of the board of directors; that such withdrawal was solicited by Scott in the interest of the Pennsylvania Company, and secured by Brooks through the aid and support of Smith, Layng and Janes, employés of the Pennsylvania Company, all of whom were aided and abetted by Henry C. Lewis and Joseph Fiske, two directors of said company, also deceased, both of whom were directors of the Coldwater, Marshall and Mackinaw Railroad Company, to which company was to be given by Scott and Cass, the trustees, a large portion of the property of the Coldwater Company, to induce them to favor the withdrawal of their answer. That the withdrawal of said defence was the fraudulent act of Scott and Brooks, aided and abetted by the directors conspiring together to cheat the Coldwater Company, and to benefit the Pennsylvania Company; that, in furtherance of such fraudulent scheme, Joseph Lessley, an employé of the Pennsylvania Railroad Company, also made defendant, bid off the property, and in so doing acted only as agent or trustee of the Pennsylvania Company, which was the only real party in interest. That the Pennsylvania Company organized the Northwestern Ohio Railway Company, which is now the nominal owner of so much of the road of the Coldwater Company as lies between Tiffin and Mansfield, and that the Pennsylvania Company is operating that part of said road as the nominal lessee of the Northwestern, which the bill averred is but a branch of the Pennsylvania Company, and in their relations to the said road the two corporations are identical. That, in the operation of that part of the said road, the Pennsylvania Company has accumulated large earnings, and has derived large revenue and receipts from sales, leases and other sources from that portion of the Coldwater road between Tiffin, Ohio, and Allegan in Michigan, and that the Pennsyl-

vania Company is now operating, and will continue to operate, said road, and will dispose of and encumber its property to the irreparable injury of the Coldwater Company, unless restrained, etc. The bill further averred that until recently neither the plaintiff nor any of those whom he represents had any knowledge of the contract of May 4, 1872, by which the Pennsylvania Company was bound to pay the interest as it accrued upon the bonds, and he believes that such knowledge was purposely kept from plaintiff and the other stockholders, as well as from some of the directors of the Coldwater Company, by the Pennsylvania Company and by Scott and Brooks, for the purpose of carrying out the fraudulent scheme set forth. That at the time of the sale of such property, and the application of the proceeds of such sale to the payment of interest upon the bonds, the Pennsylvania Company was under obligation to pay such interest by the terms of its contract of May 4, 1872, and there was no liability on the part of the Coldwater Company to pay the same, all of which facts were known to the Pennsylvania Company, to Scott and Cass, trustees, and to Brooks and the other directors referred to, and that they conspired to keep such knowledge from the plaintiff and from other stockholders.

The bill prayed that the decree of foreclosure and order of sale and all other proceedings be vacated; that the answer withdrawn be reinstated; that the case be held for further hearing upon the issues joined by the bill and answer in the foreclosure suit; that the defendant Cass, then surviving trustee, be required to account; that the Pennsylvania Company be held to have received the rents, issues, and profits from all of said railroad property in trust for the benefit and use of the Coldwater Company; and that a receiver be appointed and an injunction issued against the further selling, leasing, or otherwise encumbering the property of the Coldwater Company during the pendency of the suit. There were annexed as exhibits to the bill the construction contract of July 20, 1871, the agreement of the Pennsylvania Company of May 4, 1872, and a complete transcript of the proceedings in the foreclosure suit.

The answer of the defendant, the Coldwater Company, to the bill of foreclosure in that suit averred that the company was not legally incorporated until January 6, 1873, and that prior to that date it possessed no power or authority to execute either the bonds or mortgages, and denied that they were the act of the corporation or constituted any valid lien upon its property; that while the company was created by the consolidation of a Michigan and an Ohio corporation by an agreement of April 13, 1871, no election of directors of said consolidated company was held until January 6, 1873, and that, until such election, the consolidated company did not succeed to the rights and franchises of the original corporation, nor was its organization perfect and complete until such election, nor did it have power to make contracts and incur liabilities; that the agreement of July 20, 1871, was entered into with one Willard S. Hickox, on behalf of the defendant, and that he subsequently entered into a traffic contract with the Pennsylvania Company, assuming to act for the Coldwater Company, and as president thereof. The answer further set up the contract of May 4, 1872, and alleged that at the date of the delivery of the bonds to the Pennsylvania Company such company was not entitled to any portion thereof; that " none of said bonds are held by *bona fide* owners, but the pretended holders and owners thereof have, and are chargeable with, notice of all the matters herein set forth, and all of the equities of the defendant arising therefrom." That the Pennsylvania Company had never earned the stock fraudulently delivered to it, nor had it entitled itself to any interest on the bonds delivered as aforesaid. The other allegations of the answer were much the same as those of the bill in the present case.

The bill was subsequently amended, and general demurrers were filed both to the original and amended bills, and upon the hearing of said demurrers the Circuit Court made a decree dismissing the bill.  36 Fed. Rep. 627.  From this decree the plaintiff appealed to this court.

*Mr. John H. Doyle* for appellant contended, upon the points discussed in the opinion of the court:

I. Stockholders are not chargeable with notice; are not bound to examine records: and are not bound to suspect or presume frauds by their directors. *Pacific Railroad of Missouri* v. *Missouri Pacific Railway*, 111 U. S. 505; *Kilbourn* v. *Sunderland*, 130 U. S. 505.

II. As to laches, we recognize the fact that equity does not encourage stale demands or claims, and that it requires promptness and diligence on the part of its suitors. But no application of an equitable rule will ever be permitted to work inequity. What is diligence, or what constitutes a stale equity, are questions which depend upon the facts and circumstances of each case, and not on lapse of time alone. *Paschall* v. *Hinderer*, 28 Ohio St. 568.

Laches presupposes knowledge or neglectful ignorance. Where the party is ignorant of his rights, and is guilty of no negligence, he can never be said to be too late in asserting his claim, when he does it upon learning of them, until some statute of limitation bars him, and this without reference to fraud or concealment; but much less can it be said that his demand is stale, when by the fraud of the party adverse to him he has been prevented from sooner asserting it. See also *Meader* v. *Norton*, 11 Wall. 442; *Boomer* v. *French*, 40 Iowa, 601; *Humphreys* v. *Mattoon*, 43 Iowa, 556; *Reed* v. *Minell*, 30 Alabama, 61; *Wilson* v. *Ivy*, 32 Mississippi, 233; *Buckner* v. *Calcate*, 28 Mississippi, 432; *Hudson* v. *Wheeler*, 34 Texas, 356; *Munson* v. *Hallowell*, 26 Texas, 475; *S. C.*, 84 Am. Dec. 582; *Peck* v. *Bullard*, 2 Humph. 41.

*Mr. J. T. Brooks* for appellees submitted on his brief.

MR. JUSTICE BROWN, after stating the case as above reported, delivered the opinion of the court.

The bill in this case was dismissed in the court below upon the ground of laches, and also for the want of equity. The propriety of this action is now before us for review.

As the alleged fraudulent sale of this road, which constitutes the gravamen of the bill, took place August 28, 1877,

and the bill was not filed until August 30, 1887, ten years thereafter, there is certainly a presumption of laches, which it is incumbent upon the plaintiff to rebut. His reply is that he did not discover the fraud until a few months before the filing of the bill. The allegation of the original bill in that particular is very general, namely, that "until within a few months prior to the filing of this bill, he and those whom he represents were entirely ignorant of each and all of the fraudulent proceedings hereinafter set forth, and that this bill of complaint was filed in this court as soon after the acts of fraud, hereinafter set forth, came to his knowledge, as he could satisfy himself of the truth thereof. . . . And your orator had no knowledge of any of the fraudulent acts hereinbefore complained of, until very recently accidentally discovered." The amended bill is much more specific in its details, and avers that a certain supplemental mortgage, which appears to have been executed by the Coldwater Company, October 1, 1872, to the same parties as trustees, for the purpose of effecting the sale and negotiation of its bonds, at the time of its execution by the officers of the company, contained a full reference to the contract of May 4, 1872, the same having been inserted for the purpose of giving to all the purchasers of bonds due notice regarding the obligations of the Pennsylvania Company; but that after the execution of said supplemental mortgage, and the same had come into the possession of the officers of the Pennsylvania Company, it was altered by striking out all reference to the interest contract of May 4, 1872, or by taking out of the mortgage the page on which said reference was made, and substituting therefor another page in which said reference was omitted, and the mortgage was recorded as so altered. That the plaintiff and the other stockholders were thereby kept from all knowledge of this contract, and of the obligations of the Pennsylvania Company, and were also ignorant of the alteration of the supplemental mortgage until after the filing of the original bill. The amended bill further avers that, during all this time, the records of the railroad company were kept out of the reach of the stockholders; that no meeting of stockholders

was ever called after that of January, 1874; no notice was given for the election of directors; and that the knowledge of the contract of May 4, 1872, was purposely kept from the stockholders, plaintiff believing that the decree of foreclosure was final and the company hopelessly insolvent, and that there was no advantage in keeping up the organization of the company, and hence no annual meetings were called or held, all of which was brought about by the Pennsylvania Company as a part of the scheme and conspiracy to obtain the property, and defraud the stockholders of the Coldwater Company out of the same. Plaintiff further alleged that some time during the month of May, 1886, he was shown a copy of the contract of May 4, 1872; that until that time he neither knew or had any means of knowing or suspecting the unlawful proceedings alleged in the bill, or that there was or could be any lawful or valid defence to the foreclosure; that he began at once a careful examination of all the facts, but was greatly retarded by his inability to discover the records or papers of the company, or to find the original of this contract, and did not find them until within six months of the time of filing the bill. That the majority of the board of directors was made up of the officers and employés of the Pennsylvania Company, and, acting in this interest, kept from stockholders all means of obtaining information, and neglected to make reports or call stockholders' meetings for the purpose of enabling them to obtain information; and that if the plaintiff had known of the existence of such contract, or any of the matters in defence of the bill of foreclosure during the pendency of those proceedings, he would have called the same to the attention of the court.

Do these allegations exhibit such a state of facts as acquits the plaintiff of the charge of laches? Taken literally, they show that plaintiff had no knowledge of the contract of May 4, 1872, until May, 1886; but it also appears that in the original answer to the foreclosure bill, which was filed March 1, 1876, the substance of this contract was set out, and the same allegations of fraud with respect to the conduct of the Pennsylvania Company up to that time were made in the

answer as are made in the plaintiff's bill in this case.  This answer, though nominally withdrawn by consent of the parties, does not appear to have been actually taken from the files, and, being a part of the records of the court, the presumption is that it would not be so taken away without leave of the court.  It is also certified here by the clerk as a part of the record of the foreclosure suit.  Not only was the contract set forth in this answer, but in the answer and cross petition of Swan, Rose & Co., judgment creditors of the road to the amount of $600,000, which was filed December 18, 1876, the same contract was set forth, and the authority of Hickox, the president of the defendant company, to make such contract was denied; and it was averred that the Pennsylvania Company had wrongfully obtained certificates for a million and a half of stock, and had assumed to manage and control the affairs of the company.

The defence of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts.  Especially is this the case where the party complaining is a resident of the neighborhood in which the fraud is alleged to have taken place, and the subject of such fraud is a railroad with whose ownership and management the public, and certainly the stockholders, may be presumed to have some familiarity.  The foreclosure of this road could not have taken place without actual as well as legal knowledge of the fact by its stockholders, and if they believed they had any valuable interest to protect, it was their duty to have informed themselves by an inspection of the records of the court in which the foreclosure was carried on, of what was being done, and to have taken steps to protect themselves, if they had reason to believe their rights were being sacrificed by the directors.  If a person be ignorant of his interest in a certain transaction, no negligence is imputable to him for

failing to inform himself of his rights; but if he is aware of his interest, and knows that proceedings are pending the result of which may be prejudicial to such interests, he is bound to look into such proceedings so far as to see that no action is taken to his detriment. An examination of the records in this case would have apprised the plaintiff not only of the existence of the contract of May 4, 1872, but of the alleged fraudulent conduct of the Pennsylvania Company thereunder, and of the withdrawal of their answer by the directors, which is now claimed to be decisive proof of fraud. An inquiry of the directors, two of whom had protested against the resolution to withdraw the answer, and were within easy reach of the plaintiff, would have disclosed all the material facts set forth in plaintiff's bill, even to the reasons assigned for withdrawing the answer. The slightest effort on his part would have apprised him of the proceedings subsequent to the sale; of the purchase of the road by Lessley, the alleged employé of the Pennsylvania Company; of the subsequent organization of the Northwestern Ohio Railway Company; and of the lease of the new railway company to the Pennsylvania Company. Had he asked the leave of the court to intervene for the protection of his interest, it would have undoubtedly acceded to his request. Instead of this, he permits the sale to take place, and the road to pass into the hands of a new corporation, which has operated it for ten years without objection from the bondholders or creditors of the Coldwater Company, and without question as to its title. In the meantime many of the witnesses, including both Cass and Scott, trustees, whose alleged fraudulent betrayal of their trust constitutes the gravamen of this bill, are dead, as well as Lewis, the president, and Fish and F. V. Smith, directors of the defendant company, one of whom participated with Lewis in the meeting at which the attorneys were instructed to withdraw their defence, and all opportunity of explanation from them is lost. It is evident that the plaintiff in this suit has fallen far short of that degree of diligence which, under the most recent decisions of this court, the law exacts in condonation of this long delay. *Bailey* v. *Glover*, 21 Wall. 342;

*Hammond* v. *Hopkins*, 143 U. S. 224; *Hoyt* v. *Latham*, 143 U. S. 553; *Felix* v. *Patrick*, 145 U. S. 317.

We are the more readily reconciled to this conclusion from the fact that it does not appear that, if this sale were set aside and held for naught, the decree would redound to the advantage of the plaintiff. The only allegation as to his interest is that he is the owner and holder of 258 shares of the capital stock of the company of a par value of $12,900. It does not appear how much of its authorized capital stock of $4,000,000 was actually issued, though there is an allegation in the bill that the Pennsylvania Company wrongfully obtained $1,500,000 of the stock of the Coldwater Company in addition to the preferred stock, which the plaintiff averred was to be issued, for actual expenditures at cash values made by this company. Whatever amount was issued, it is safe to infer that plaintiff's interest was comparatively very small. If the decree were set aside and the case reinstated as he demands, his rights, as well as those of the other stockholders, would be subordinate to those of the bondholders, and probably also to those of the judgment creditors of the road. It is a difficult matter to say what amount of bonds was earned by the Pennsylvania Company, although it is admitted that iron was laid on 75 miles of the road, and the road completed for at least 47 miles, for which the Pennsylvania would be entitled to bonds at $20,000 per mile, and also that the company raised nothing toward the sinking fund which was provided for by the original mortgage. Under these circumstances, the trustees could hardly fail to obtain another decree of foreclosure for a large amount; and as the road was hopelessly insolvent, it is hardly within the bounds of possibility that it should sell for more than enough to pay the amount adjudged to be due, to say nothing of the judgment creditors' claims of Swan, Rose & Co. In a case of this kind, where the plaintiff seeks to annul a long-standing decree, it is a circumstance against him that he does not show a probability at least of a personal advantage to himself by its being done. A court of equity is not called upon to do a vain thing. It will not entertain a bill simply to vindicate an

abstract principle of justice or to compel the defendants to buy their peace, and if it appear that the parties really in interest are content that the decree shall stand, it should not be set aside at the suit of one who could not possibly obtain a benefit from such action.

In the view we have taken of this case upon the question of laches, it is unnecessary to consider whether the plaintiff has made such a case of fraud in the original decree as justifies the interposition of a court of equity.

The decree of the court dismissing the bill is, therefore,

*Affirmed.*