**WINDOW GLASS MACH. CO. et al. v. PITTS-
BURGH PLATE GLASS CO.**

No. 250, May Term, 1919.

District Court, W. D. Pennsylvania.

Nov. 9, 1921.

Decree affirmed in 284 F. 645.

Bakewell, Byrnes & Stebbins, of Pittsburgh, Pa., for Window Glass Machine Co.

Christy & Christy, Marshall A. Christy, and James C. Bradley, all of Pittsburgh, Pa., Charles Neave, of New York City, and Frederick P. Fish, of Boston, Mass., for Pittsburgh Plate Glass Co.

THOMSON, District Judge.

I approach the consideration of this case with a feeling something akin to that of the returning traveler who sights land, after a long voyage, but realizes that there are some dangerous shoals before entering the harbor. On the threshold of the case, we are confronted with a grave problem, that of the laches of the plaintiffs. The learned counsel on both sides have made able and persuasive arguments and, supported by numerous authorities, have reached opposite conclusions. The question undoubtedly deserves the most earnest consideration, requiring, at the same time, a discriminating application of legal principles.

The bill charges infringement of certain claims in fourteen patents of the plaintiffs, involving the drawing of glass cylinders by machinery. These embrace the three original Lubbers patents, Nos. 702,013, 702,014, and 702,015. In the first and third of these, the claims in suit relate solely to what is termed the "molten bath," while the second, in addition, has to do with increasing the rate of air supply as the cylinder lengthens, and the taking down of the cylinder when drawn; the Chambers patent, involving the gradual increase in speed of draw; the three-speed patent of Lubbers, and his two patents covering the vent; two take-down patents to Speer & Harvey; the Hitner patent for capping-off; the Bridge patent covering the horse on which to rest the cylinder when drawn; the Hart patent for drawing the cylinder without the water-cooled ring, and drawing the cylinder in an inclosure with confined atmosphere; and the patent to Speer & Harvey of what is known as "shawling" or cutting the cylinder longitudinally.

All of these are co-related in the general process of cylinder drawing.

As to defense of laches: In considering this question, we must remember that plaintiffs are in a court of equity solely because they ask for injunctive relief against further infringements. On no other ground has the court jurisdiction of the case. Infringement is a tort, and for the damages resulting, the injured party has his remedy at law. The right to an accounting is only an incident to the right to an injunction. If the latter does not exist, the former cannot be decreed. The willful infringer acquires no right, and secures no immunity, by repeated infringements, except that arising from the statute of limitations, which is a statute of repose. Limitation, such as the six-year limit for all actions for infringement, both at law and in equity, is a mere matter of time, and when the time has run, saves even the most willful trespasser from the consequences of his acts. Unlike such limitation, laches is not at all a mere matter of time, but rests on the inequity, under the circumstances, of permitting the claim to be enforced. Where inequity would result, the plaintiff must fail, for "the jurisdiction to interfere is purely equitable, and must be governed by equitable principles. One of the first of these principles is, that parties going into equity must do equity." Mere lapse of time may alone be sufficient to bar a plaintiff from equitable relief; and where there is unusual delay, the burden is upon the plaintiff to establish the impediments which prevented action; how he so long remained ignorant of his rights; what the means were by which respondent wrongfully and fraudulently kept him in ignorance; and how and when he first came to a knowledge of the matters charged in his bill. Badger v. Badger, 2 Wall. 87, 17 L. Ed. 836; Hardt v. Heidweyer, 152 U. S. 547, 14 S. Ct. 671, 38 L. Ed. 548.

The authorities draw a clear distinction between the claim of willful trespasser, and him who has acted in good faith. It is the difference between intentional wrong and un-

intentional error. On the criminal side of the court, it is the difference between guilt and innocence. The distinction is self-evident. All courts recognize it, and courts of equity particularly, looking to the heart and conscience of the case, are especially alert to recognize and apply it. Great Western Ry. Co. v. Oxford Ry. Co. 3 DeGux, M. & G. 341; Ashhurst's Appeal, 60 Pa. 290; Lansdale v. Smith, 106 U. S. 391, 1 S. Ct. 350, 27 L. Ed. 219.

In Prince's Metallic Paint Co. v. Prince Mfg. Co., 57 F. 938, 944, Judge Acheson, speaking in the Circuit Court of Appeals, said:

"In courts of equity the rule is to withhold relief where there has been unreasonable delay in prosecuting a claim, or long acquiescence in the assertion of adverse rights. * * * Again and again has it been judicially declared that nothing can call into activity a court of equity but 'conscience, good faith, and reasonable diligence,' citing many cases.

With these principles in mind, let us turn to the facts, upon which laches must always depend. Mr. Slingluff, an inventor, had been employed by the American Window Glass Company and was familiar with its operations. In April, 1906, about a year and a half after he severed his connection with that company, he was taken by James A. Chambers, a glass manufacturer of wide experience, to the Pittsburgh Plate Glass Company, stating that the former had some inventions which he (Chambers) considered of very great value, his method relating to the drawing of cylinders directly from the tank, instead of from a pot as practiced by the American Company; that in his experience in manufacturing glass cylinders, he had always desired to draw from the tank, as ladling the glass, necessary in the pot method, involved expense and injured the quality of the glass; and that he thought great advantages, both in quality and cost of production, would result from the use of the Slingluff method; that in the various efforts which they had made to draw direct from the tank, they had encountered serious difficulties which he believed the Slingluff method would obviate. He further stated that with his knowledge of the American Company's patents, some of which he had taken out, he thought that the Slingluff method of production was entirely outside of the field of their patents, which view was later confirmed by the defendants' attorneys. It was also stated by Slingluff that he had offered his invention to the American Window Glass Company, which was refused. Acting upon this information, the defendant company leased a small plant in Allegheny, and in September, 1906, began there to conduct a series of experiments on the Slingluff method which continued for about a year, and being satisfied with the results, the company was considering the beginning of the manufacture of glass on a commercial scale. On September 30, 1907, the American Window Glass Company filed a bill in equity against the defendant herein, and Chambers and Slingluff, in which they averred that the process used by the defendant company was an infringement of their patents, and asked for an accounting and an injunction. The bill averred infringement of patents Nos. 702,013, 702,014, 702,015, 702,016, and 702,017. Paragraph 12 of the bill is almost identical with paragraph 7 of the present bill, as to defendants' notice of the granting of plaintiffs' letters patent and their infringement thereof, the manufacture, sale, and use after notice of the apparatus and methods claimed and embraced in said patents, in violation of plaintiffs' exclusive rights, for which they claimed profits and damages. A month in advance of the time prescribed by the rules, to the bill filed the defendant company filed a responsive answer, setting up their defense, and then stating as follows:

"This defendant admits, solely for the purposes of this case, that it is engaged in the manufacture of window glass, but only by the use of methods and apparatus substantially different in all material respects from the methods and apparatus described and claimed in said recited patents, and each of them."

At the same time, defendants' counsel wrote a letter to counsel for plaintiffs, inclosing copies of the several answers, suggesting that suits be prepared for trial and argued and decided as soon as possible, and suggesting a readiness to co-operate in all proper steps to bring the cases to an early hearing. Plaintiffs made no reply to this communication, and a little later moved the court for permission to dismiss their bill. This was strenuously opposed by the defendant company, the reasons for such opposition being set forth in an affidavit filed by the president, William L. Clause, setting forth, after the formal parts, as follows:

"I am president of the Pittsburgh Plate Glass Company, one of the defendants herein.

"I have read the motion of the complainants to dismiss the Bill of Complaint without prejudice. The facts are as follows:

"For some time past The Pittsburgh Plate Glass Company has been experimenting with a small furnace, in Allegheny, in order to determine the practicability of certain methods and apparatus for drawing window-glass. These operations were purely experimental and none of the glass manufactured was sold.

"Having satisfied itself through these experiments, The Pittsburgh Plate Glass Company entered into negotiations last summer for the purchase of a plant suitable for the manufacture of window-glass commercially.

"On September 30th, 1907, the Bill of Complaint was filed in this case.

"At or about the date of the filing of the Bill of Complaint, but whether immediately before or immediately after I do not now recall, the experiments in Allegheny were discontinued, the Plate Glass Company being satisfied with the result of them and having no reason for their further continuance.

"Since that time the Plate Glass Company has been engaged in making arrangements for acquiring the commercial plant above referred to, and equipping it with proper furnaces and machinery for the drawing of glass. It has prepared working drawings of the furnace and apparatus which it proposes to employ, and is now engaged in the construction of the same. Its intention is, and has been since the negotiations for the purchase of the plant were commenced, to engage in the manufacture of window-glass as soon as the plant can be properly equipped, and it expects to commence such manufacture on a commercial scale within the next three months. This, I believe, is well known to complainants' managing officers.

"Upon the filing of the Bill of Complaint herein the Company instructed its attorneys to take all proper steps to prepare and bring the case to an early hearing, the reason being that the Company, being satisfied with the commercial practicability of the methods and apparatus which it proposes to employ, and having been advised by counsel that the said methods and apparatus are not covered by any outstanding patents, proposes, as rapidly as commercial conditions may permit or render desirable, to acquire or build other plants for the purpose of drawing window-glass and thereby largely increase its investment in that business.

"Acting under said instructions, the Answer herein was prepared by counsel, and was executed and filed on the appearance day, one month in advance of the time required by the Rules of Court. In the said Answer it was stated, inter alia,

"'This defendant admits, solely for the purposes of this case, that it is engaged in the manufacture of window glass, but only by the use of methods and apparatus substantially different in all material respects from the methods and apparatus described and claimed in, said recited patents, and each of them.'

"Upon the filing of said Answer, the Company's counsel communicated with counsel for the complainants, by the following letter:

"'We hand you herewith copies of the several answers of the Pittsburgh Plate Glass Company, James A. Chambers and Harry G. Slingluff, in the two suits brought against them by the Window Glass Machine Company and the American Window Glass Company, in the U. S. Circuit Court for this District, Nos. 21 and 22, November Term, 1907. We have filed the originals of these answers in the Clerk's Office today.

"'We assume that it is for the interest of all parties that these suits should be prepared for trial, and argued and decided as soon as possible.

"'To that end we would suggest a fair division of time for the taking of testimony by the respective parties, say until May first, or such earlier date as you may think sufficient, and a setting of the case for argument at May Term, 1908. We are ready to cooperate with you in all proper steps to bring these cases to an early hearing.

"'Please advise us whether the arrangement above indicated will be satisfactory to you, and if you see any objection to it, what you think would be a proper one.'

"At or about the same time, as I am informed, our counsel stated verbally to counsel for the complainants, that if complainants would agree to speed the cause, our company is prepared to furnish full and complete drawings illustrating the furnace and apparatus which it proposes to employ in the manufacture of window-glass, and which drawings are the drawings above referred to, already prepared for the actual construction and operation at the plant which has already been acquired. We are still ready to furnish said drawings to the complainants, and to cooperate with them in all proper steps to speed the preparation and trial of the suit.

"No reply has been received to the letter above quoted, or to our offer to furnish the drawings above mentioned.

"W. L. Clause.

"Sworn and subscribed before me this 9th day of December, 1907."

In the face of this protest, on December 9, 1907, the bill was dismissed without prejudice. In this situation, the suit having been withdrawn, the defendant company consummated the purchase of the Mount Vernon plant, equipped it with furnaces and machinery, and began operations on a commercial scale in August, 1909, gradually enlarging their work until they had an investment of $375,000. These operations continued without notice or objection of any kind from the plaintiffs, for more than six years or until July of 1919, when the plaintiffs, having recently commenced certain suits for infringement of their patents against other companies, again notified the defendant of infringement, and advised them that they had a bill prepared and were ready to file it. Defendant's counsel agreed to accept service, but as a personal accommodation asked that the actual filing of the bill be delayed for two or three weeks, which was agreed to. After this, nothing further was heard of the suit until nearly four and a half years later, when the present bill was filed on December 31, 1918, eleven years after the bringing of the first suit, and almost eleven years from the time defendant's commercial operations began. At the time the notice was served, the defendant company was contemplating the erection of a large glass plant at Clarksburg, W. Va., but on account of the notice, deferred action for six months, when, no bill having been filed, the company erected its plant in the early part of 1915, and began operations in August, expending in the investment $550,000.

What is the conclusion to be drawn from these facts? In the first place, I find that the defendant company was not a willful infringer, but was acting in good faith.

In plaintiff's forehearth method as described in the Lubbers patents, the forehearth from which the draw is made is a projection from the side of the furnace, a sheltered cove, as it has been designated, in which the depth of the glass was considerably less than that in the main furnace. Into it the glass flowed from the furnace, but the currents of heat from the tank were largely shut off from the drawing point by reason of its sheltered location and the fact that the topstone was lower than the roof of the main furnace. To draw cylinders from the tank proper, from a constantly maintained body of molten glass, of the full tank depth, remelting the glass in suit at the drawing point appeared to be a new conception. Neither the plaintiffs nor any other prior to Slingluff, so far as I know, had done so, and the principles of the Slingluff method were embodied in certain patents which he procured.

While subsequent decisions may have held that the forehearth principle of the Lubbers patents was broad enough to include the drawing from the tank proper, the drawing point being sheltered from the heat currents by various means and devices; yet we can well understand that the defendant, relying on the patents which Slingluff had obtained, and the advice of learned counsel as to their validity and noninfringement, adopted the Slingluff method in perfect good faith. Good faith is almost conclusively shown by the fact that when the very question of validity and infringement was before the court for decision, defendant was anxious to meet the issue, insisted on an early hearing, protested against the proposed dismissal of the suit, and offered to furnish full and complete drawings of the furnace and appliances which it proposed to employ.

In the second place, plaintiff's conduct in thus dismissing the bill, avoiding the issue raised, and ignoring the information proffered, misled the defendant to its detriment; its action went far to justify the belief that plaintiff had abandoned its claims of infringement, and was a potent and controlling factor in defendant's conclusion to establish the industry at Mount Vernon, at an enormous expenditure of money. This well-grounded belief was fully borne out by more than six years of continuous operation on a large scale of the Mount Vernon factory, without notice or objection of any kind. Plaintiff's answer in justification of its long delay is wholly inadequate. It has not met the burden imposed upon it. It is not sufficient to say that the defendant's plant was experimental only, and that the work in Allegheny had stopped. This because it received express notice that the defendants, by reason of the satisfactory results of their experiments, were making arrangements to acquire and equip a plant with the very appliances complained of. Against such threatened use of infringing devices, an injunction would lie.

Equally unstable is the claim of continuous lack of knowledge as to the operations of the defendant. This, first, because plaintiffs

did not avail themselves of the opportunity for full information as to methods and appliances, which was freely offered to them when the issue was first raised; and, secondly, because they had from time to time opportunity to learn of defendant's methods and operations during the years of their procrastination. The evidence shows that from the time the Mount Vernon plant was built until the summer of 1914, there was a frequent interchange of workmen between the American Company's factories and that of the defendant, and that during the period in question there were thirty or forty men who went from the Mount Vernon factory to the various factories of the American Window Glass Company. It is hardly conceivable that this could occur and yet plaintiffs, if diligent, remain in ignorance.

■ When want of knowledge is set up as a defense to laches, the plaintiff is chargeable with such knowledge as inquiry and reasonable diligence would have furnished. Foster v. R. R. Co., 146 U. S. 99, 13 S. Ct. 28, 36 L. Ed. 899; Johnston v. Standard Mining Co., 148 U. S. 360, 13 S. Ct. 585, 37 L. Ed. 480.

If it be possible, under any equitable principle. that plaintiffs' right of action had not perished through laches in 1914, what justification can be claimed for a further procrastination of more than four years in bringing suit? It is not sufficient to say that they were not bound to proceed against all infringers at the same time. Against this defendant, on every principle of equity, their action was long overdue, and notice and a proceeding against others does not meet the case. Even when the bill was prepared and notice given of an intention to file it, plaintiffs fail again and stand idly by while defendant builds and equips another factory, at an expenditure of more than half a million of dollars.

■ The notice of 1914 can hardly be regarded as more than a fitful start from a profound sleep, extending over a period of eleven years. So far as the Lubbers patents, No. 702,013, No. 702,014, and No. 702,015, are involved in the bill, plaintiffs are equitably barred from relief by their laches and acquiescence, and as to these the bill will be dismissed.

Of the remaining patents, three are new, while the following patents have been adjudicated in this court as valid, in previous litigation.

Chambers Patent, No. 762,880, and Lubbers Patent, No. 822,678.

■ The first of these covers the gradual increase of speed during the drawing of the cylinder, while the second is known as the "three-speed" patent.

Infringement of these patents at the Clarksburg plant is not controverted, nor at the Mount Vernon plant, prior to January 1, 1920. After that date, I find that there has been no infringement of either patent at Mount Vernon. The operation of drawing is as follows: A stop is made about an inch or two above the glass when the draw is started. The cap is then formed by the high-pressure system, without a stop. The body of the cylinder is drawn at low pressure with occasional puffs from the high-pressure line, to maintain the pressure sufficient to hold the cylinder out. The rheostats, which formerly controlled the speed, were removed, leaving the blower with no control over the speed, which remains uniform throughout the draw. This results in drawing the glass thicker as the cylinder lengthens, so that glass of single strength is cut from the first portion, and often glass of double strength is cut from the upper portion of the cylinder.

Lubbers Patents, Nos. 886,618 and 1,020,920.

■ These cover what is known as the vent. In the first of these, the claims in suit were all sustained in the Consolidated and Okmulgee cases. In the second, the claims in suit were sustained in the Consolidated, Brookville, and other cases. Being valid, there only remains to consider the question of infringement. It appears that for a very brief period, the defendant employed a vent at the commencement of its operations, but it was discarded, and no vent as such has been used by the defendant within the statutory period of six years prior to the filing of the bill. Plaintiffs have sought to find in defendant's apparatus something equivalent to, and which accomplishes the purpose of, a vent. They claim to find this in a leak in the air system at the joint where the bell-shaped terminal of the air line rests on the top of the bait pipe. When such leakage occurs, it is unintentional, and results from a careless hanging of the bait. Such leak, when it occurs, is so decided a disadvantage in operation, that when discovered the blowers try to have it corrected at once; failing in this, they must resort to puffs of high-pressure air, to keep the cylinder out.

It is claimed again that the presence on defendant's drawing cages of the drums, or reservoirs, have a regulating function akin to a vent. I do not think this position is sustained by the evidence.

490

It is claimed again that in defendant's air system, the fan itself, in its construction and operation, acts as a vent and serves to regulate the pressure in the cylinder. It appears that the fans used are of standard type, bought in the open market, and operate as any fans feeding air through a pipe above atmospheric pressure. Where the pressure in the cylinder decreases, the fan draws in more air, supplying the deficiency. When the pressure in the cylinder increases, less air is taken in by the fan, which operation tends to keep the pressure constant. The open vent is something wholly different. It is a self-acting safety valve. Professor Trinks describes a fan as an open hole with blades in it, equally open whether the blades are revolving or stationary. It is therefore apparent that it is not the hole in the pipe which operates as a pressure regulator, but the operation of the fan, by which the amount of air delivered by it, varies according to the conditions in the closed cylinder to which the pipe leads. In practical operation, as one fan runs four cylinders, if one of the cylinders had too little air, the blower could not increase the air pressure in the line by increasing the fan revolutions, as this would probably spoil three cylinders to improve one. Hence, instead of increasing the air pressure generally in the line, the blower would nick in the high-pressure line by a puff, on the line of that particular cylinder, and thus would not affect the others.

The claims in suit of patent No. 886,618 are 1 and 20 to 25, inclusive, and the claims in suit of patent No. 1,020,920 are 6, 7, and 8. I find none of these to be infringed by defendant's operation.

Lubbers Surface Tension patent, No. 914,588.

This patent covers the invention of overcoming the drawing of thick-and-thin glass; that is, glass which varies in thickness at different points in the circumference of the cylinder. This inequality in the thickness of glass is largely due to differences in temperature conditions at different points on the glass, or in the receptacle from which the draw is made. In the specifications the patent points out that these differences can be largely compensated for by adjusting the pot and drawing tool relatively to each other in a lateral direction. The patent then describes appliances suitable to accomplish this end by making the bait adjustable on its carriage in two directions, at right angles to each other from front to back, and from side to side. It is pointed out that such adjust-

ments may be obtained by moving the bait or moving the receptacle. The claims in suit are 5, 6, and 7. The broadest of these is claim 7, which reads as follows:

"7. The method of drawing glass of substantially uniform thickness from a molten glass bath, consisting in adjusting the point of draw to provide for substantially uniform surface tension in the different parts of the article being drawn; substantially as described."

The word "adjusting" means a shifting of the point of draw from time to time, as conditions may require, to compensate for the differences in heat conditions. During the early part of defendant's operations, a ring was used, either floating or resting on a ledge in combination with the topstone. Drawing, as they were, from a forehearth, where the glass was hottest at the tank end, they had much trouble with thick-and-thin glass. Later, perhaps in 1911, Slingluff introduced his present "anchor," with the lip on the inside projecting under the glass at the tank end of the forehearth. This lip appears to equalize the temperature of the glass in the drawing opening. It extends around to the sides, gradually diminishing in length. As there is less depth of intensely hot glass lying above the lip than in those parts of the drawing opening where there is no lip, the temperature is seemingly regulated in the direction from front to back, and perhaps to some extent laterally. The regulation of heat conditions is aided by the tipping of the topstone, which operation is not covered by the patent in suit. In this operation, the bait is not centered with the surface of the glass in the drawing opening, but is centered with the inlet opening beneath. The lip at its widest point extends inwardly six inches, so that the bait is set in line with a point three inches outwardly from the center of the glass of the surface. The evidence shows that this setting of the bait is made at the beginning of the fire, and thereafter there is no adjustment. When the anchor was introduced, it appears that it was intended to be tight and not adjustable, but being loosened from time to time through contact with the topstone, which was raised and lowered, it would have to be put back, and the operators from time to time made such adjustments to take care of the surface tension. Speaking of their operations at Clarksburg and at Mount Vernon prior to January, 1920, it was stipulated (C. R. p. 15):

"Both the bait itself and the anchor are capable of adjustment back and forth later-

ally and such adjustments are made from time to time as circumstances require."

Prior to January, 1920, the connections for the bait carrier and the cage were slotted, with springs provided on the carriage to permit adjustment. At that time, these were taken off and the bait carrier is fastened rigidly to the cage, leaving no opportunity for adjustment. From that time there has been no intentional adjustment of the bait, and none appears necessary. If conditions are not strictly normal, a crooked cap will result, without materially affecting the cylinder. As thus changed on January 1, 1920, at Mount Vernon, there has been no infringement of the claims in suit.

Hart Patent, No. 841,011.

Here there are six claims in suit. Claims 1, 2, and 6 relate to cooling the glass solely by the action of the atmosphere, while claims 3, 4, and 5 relate to the sheet-iron shield forming a partial enclosure for the rising cylinder. As to claims 1, 2, and 6: Claim 1, as an example, is as follows:

"The method of drawing hollow glass articles, consisting in applying heat to a pot or receptacle containing molten glass, protecting the glass at the drawing point from such applied heat, drawing a hollow glass article upwardly from the bath, and cooling the glass and causing it to set solely by the action of the atmosphere, substantially as described."

If these claims are to be construed broadly to apply to the defendant's practice, they involve the old arrangement of the Lubbers patents, Nos. 702,013, 702,014, and 702,016, with the omission of the water-cooled ring. The addition of the water-cooled ring was an element of invention on those patents, and it may be questionable whether its omission by Hart constituted invention, the remaining elements performing the same function as before. Besides this, Lubbers in his patent No. 702,016, states that, "The use of the outer water-cooled ring may be dispensed with," with no intimation that any other cooling means was to be substituted. Lubbers and not Hart, therefore, was the first to suggest the omission of the water-cooled ring, which makes the validity of these claims at least doubtful. In the Brookville case, they were held valid, but I am not certain that the foregoing suggestions as to the Lubbers patents were called to my attention. But, if valid, they must be limited to the methods specified in them, which includes the step of applying heat to the "spot or receptacle containing molten glass." In the Brookville case we

held that the defendant there infringed, because, while it did not apply heat to the pot while in the drawing position, heat was applied to it before moving it into position to draw, and the heat retained in the vessel was imparted to the glass. But in the present case, the defendant does not use a pot, the draw being made from the mass of glass in the tank. It does not heat the drawing receptacle, but the entire mass of molten glass is heated in the furnace. Hart was dealing with a distinct body of glass in a pot or such receptacle as, owing to the limited quantity of glass, required to be especially heated to keep from cooling too much during the drawing operation. The defendant's anchor ring, which floats in the glass, cannot be regarded as a pot or receptacle. But, even if so construed, there is no operation of applying heat to it to keep its contents to a determined temperature, such as contemplated in the Hart patent. The language of the Hart claims unquestionably means the heating of the container of a segregated portion of glass, during the draw, to keep the glass during that period at a determined temperature. Defendant does not do this. The whole body of the glass in the furnace is heated all the time, as in any other tank, and there is no special heating of the circular ring and its contents during the drawing operation. If claims 1, 2, and 6 are held valid, defendant does not infringe them.

Claims 3, 4, and 5 relate to the sheet-iron shield, U-shaped in cross-section, inclosing the back and sides of the draw, forming a partly inclosed atmosphere, while allowing access to the cylinder in drawing and taking down.

It appears that the defendant's shields, used only at Clarksburg, were built by the same party and are practically identical in shape, and perform the same functions, as those of the plaintiffs. In construction they are 8 feet 6 inches from edge to edge, of the U-shaped shield, extend about 16 inches in front of the guards, begin at a point from 14 to 16 inches above the glass, to allow the raising of the topstone, and rise above 50 feet in height the full length of the draw.

The claims are method claims, requiring no particular form of apparatus, except that it must furnish such partial enclosure as gives a quiescent atmosphere. It has long been recognized in the art that drafts of air, especially on the setting and cooling cylinder, create dangerous strains which may break the cylinder. To prevent this, shields have been used in factories at various points, to

shut off such air currents from the cylinder. Defendant cites the Lubbers patent, No. 766,275, as anticipating Hart. This patent relates to the drawing of sheet glass, which neither Lubbers nor any one in his time, or before, had ever done successfully. The same citation was made, without success, in the Patent Office. Lubbers thought that to draw sheets successfully, they must be drawn up within a surrounding chamber, as otherwise they would crack and break, and provided such chamber accordingly. This might or might not be true as to sheets, but cylinders were drawn in the open air. The processes are very different in character. The air-pressure problems are not present in sheet drawing, and there are many physical differences between a rising sheet and a rising cylinder as to strength, surface tension with its resulting strains, and others. Sheets might require to be drawn in an inclosure, while cylinders, because of their form and through the annealing action of the distending hot air in the cylinder, might well be drawn in the open air. It is far from clear that the Lubbers shield anticipated Hart, and I resolve the doubt in favor of the patent. It is clear that Hart was the first in the glass drawing art to surround the cylinder on three sides with a shield, leaving it open in front to allow it to be taken down. It would be wholly impracticable to entirely surround the cylinder with a shield, even if desirable; and its desirability is doubtful, as it would probably create an upward draft like a chimney, interfering seriously with the annealing action of the air convection currents. In practical operation, they have been effective in reducing breakage. The shields as constructed undoubtedly "cut off currents of air," and may be fairly said to surround the cylinder "with a practically confined atmosphere," as expressed in claim 3; or, "an enclosed atmosphere," as expressed in claim 4; or, a "quiescent atmosphere," as expressed in claim 5.

I therefore find claims 3, 4, and 5 of the patent in suit, valid, and infringed.

#### Hitner Patent, No. 821,361.

The claims in suit are 1, 2, and 3. The gist of this patent, as I understand it, lies in a portable hand tool to be carried about and taken to different parts of the cylinder as it lies upon the horse, the tool having electric conductors and terminals, and a heating wire connected to one of the terminals and having a free end arranged to be thrown around the cylinder and brought back to the terminals. Claims 2 and 3 have been sustained in the Consolidated ([C. C. A.] 261 F. 362) and Smethport ([D. C.] 266 F. 85) Cases. Defendant's apparatus is a portable hand tool with electric conductors and terminals, having three terminals instead of two. Two of these serve as lead-in terminals, and one as a lead-out terminal. To one of the terminals the heating wire is connected at one end, and when the tool is in proper position, the capper throws the other free end of the wire around the cylinder, brings it back, and connects it with another closely adjacent terminal. Then the clip device at the end of the wire from the third or minus terminal is clipped onto the heating wire at an intermediate point about halfway around the cylinder, and the current is then turned on. This current, passing through the two plus terminals of the heating wire divides, passing around the cylinder in opposite directions to the clip, and then flows back through this clip and its wire to the minus terminal. The change in the device consists in the addition of the third terminal with its connecting wire and slip, and the converting of the two terminals into plus terminals instead of a plus and minus terminal, as in Hitner's tool. I do not think these changes have such a material bearing on the claims in suit as to avoid infringement. They are therefore held valid and infringed.

#### Bridge Patent, No. 1,006,995, for Horse to Support Cylinder for Capping Off.

The claims in suit are 1, 2, and 4. These were sustained as valid in several of the prior suits. Infringement at both of defendant's plants prior to January 1, 1920, is not denied. At or about that time, the adjustable springs were removed. The claims are therefore held valid and infringed.

The three following patents have not been adjudicated:

#### Take-down Patent, No. 824,750.

Claims 1 and 2 are in issue. These are as follows:

"1. In the manufacture of vertical drawn glass, means to support and swing the glass downwardly on a center relatively distant from the top of the glass."

"2. In the manufacture of vertical drawn glass a support for the glass, and means for swinging the top of said support downwardly."

This may be termed the basic patent on swinging the top of the cylinder and a portion of the bait over and down, instead of lowering the cylinder with the bait attached, by pulling the lower end outwardly. In this

patent, the lowering is effected by the swing of the mast on its pivot. This operation is the opposite of that which plaintiffs have heretofore employed. The claims cover, broadly, a take-down device having means for supporting and swinging a glass cylinder downwardly on a pivot, the center of which is relatively distant from the top of the glass. In the operation of the device, when the mast is swung into upright position and held there by one cord, the arms are moved up by pulling on the cord until the arms take the weight of the bait ring and glass. The hand clamp is then loosened and removed, the crane jib moved to one side to take the bait plate out of the way, the mast then being swung over and downwardly. As against the validity of this patent, the British patent to Clark is cited and urged. The Clark patent relates to drawing sheet glass only. It could not be used for cylinders. In drawing sheets, two portions of the frame were drawn together so that the rubber facings clamp and draw the glass. There is no bait or bait ring take-down, while in the patent in suit the glass is supported from the bait ring which is carried on the frame of the take-down. Clark was attempting to draw a continuously rising sheet of glass, the intention being to receive the upper portion in a clamping frame, then cut across by a diamond or cutting tool beneath it, and then swinging the frame over. To swing down such a portion, cut from the top of the rising glass, is a wholly different problem from lowering the whole cylinder rising 30 or 40 feet above the bath. I am thoroughly satisfied that the Clark device was for many reasons wholly inoperative. Hot glass cannot be cut with a diamond or cutting tool, and his method would not keep the sheet from narrowing inwardly. The device was not put into practical operation, and could not be. It was simply one of the many theoretical attempts at sheet drawing which in practice utterly failed. It is true that the patent does not purport to be limited to the drawing and taking down of glass cylinders, as claims 1 and 2 refer to the manufacture of vertical drawn glass; yet the patent states that the invention relates to apparatus for making glass and has particular reference to the manufacture of whole cylinders. I do not think the Clark patent renders invalid the claims in suit. Defendant uses a mast pivoted at the lower end, for lowering the cylinder. It engaged the bait by arms projecting from the mast, and it swings the mast over and down so that the top portion of the cylinder with the bait ring tilts over and down until the cylinder is in the horizontal position. Such differences as there are in details relate to other claims not involved in this suit.

I therefore find the claims in issue valid and infringed.

### Speer & Harvey Take-Down Patent, No. 977,685.

Claims 6, 7, 8, 9, and 10 are in suit. This patent covers certain improvements on the other take-down patent No. 824,750. It has the same broad feature of taking down by tilting the mast, which has arms engaging part of the bait. The first improvement does away with manipulating the bait by hand to disconnect it in taking-down, the detachment being effected by a relative vertical movement between the bait and the means which support it on the bait. The second main feature consists in providing the mast with sets of arms arranged in pairs, forming a horse on which the cylinder rests when taken down. The apparatus shown is duplex in form, by which two cylinders can be lowered at the same time, pairs of forks being arranged on opposite sides of the mast to receive the cylinders. The arrangement of supporting arms in pairs makes a combined take-down and horse. When swung horizontally, the cylinder is capped off between the pairs of arms, each roller length being supported by one pair. This seems to be the first patent to disclose the use of a swinging mast both as to take-down and a capping-off horse. This combination of the two devices into one avoids the lifting of the cylinder from the take-down and carrying it to a special capping-off horse, which would appear advantageous. The defendant in its operation, take down the cylinder by tipping over the top of a mast pivoted at its lower end, moves the mast arms under projectors on the bait stem, and then causes relative movement between the arms and the bait stem, causing the automatic disengagement of the bait and bait stem from the bait cage. The weight of the bait and glass are thus taken by the mast arms, which are forked to embrace the projection on the bait stem. There are a series of arms on the mast, arranged in pairs, which receive the weight of the cylinder during the swing, and defendant caps off the cylinder between the pairs of arms, using the take-down as a horse. Each roller length is carried by a pair of arms.

Claim 6 is a method claim, covering a series of steps. Among these, the novel steps are the combined steps of supporting the bait and glass from the lowering device and causing a relative vertical movement between the

bait and the elevator cage, to free the bait from the lifting cage; and the lowering of the article · and bait to a horizontal position while supported by the mast and arms.

The step of automatically freeing the bait from the cage distinguishes it from patent No. 824,750, in which the detachment is effected by hand. The bait is entirely free before the top of the cylinder begins its swing. Under this claim, · whether the · arms are swung upwardly to detach the bait or the elevator moved downwardly relative to the mast, the step of giving relative vertical movement to cause the automatic release is carried out.

Claim 7 and 8 cover the take-down device, which is arranged to swing from a vertical to a horizontal position, and having the horse attachments consisting of "a series of arms arranged in pairs on said support and adapted to receive and support the side of the article as it is lowered on said support to a horizontal position."

Claim 8 covers the same combination as claim 7, but recites the arms as adjustable.

Claim 9 covers the general type of the swinging mast take-down in combination with a bait having a hollow handle, and the means on the handle and cage for supporting the handle, viz., the forks and collar.

Claim 10 covers the same combination as claim 9, but recites that the shifting means has a fork for engaging the collar or projections on the hollow handle of the pipe in the combination. .

The presumption of validity of the claims 7 to 10, inclusive, is increased by the fact that they were sustained by the Patent Office in a · contested interference, after a motion to dissolve, supported by the prior art.

The claims in suit I find to be valid, and claims 6, 7, and 9 to be infringed. Claim 8 I find not infringed, as in defendant's structure the arms of the horse are not adjustable. I also find claim 10 not infringed, as it provides for—

"A bait provided with a hollow handle carrying a collar, means for detachably engaging the hollow handle with the drawing means, and shifting means provided with a fork for engaging the said collar."

In defendant's construction, the bait is provided with a bail for supporting it, instead of the collar on the hollow handle as specified in the claim. The hollow handle seems to merely act as an air conduit, and is not used to support the bait.

Speer & Harvey Patent, No. 828,147.

 This patent covers a system known as "shawling," where the cylinders are made · large and split into a number of segments before flattening. From the beginning of the cylinder drawing art, all cylinders have been in short lengths, and then split lengthwise for the purpose of flattening into sheets, the sheets then being cut into the required sizes. This patent covers the supposed invention of splitting the cylinder, not once, but twice, before flattening, thus reducing the size of the sheets. It is claimed that this method increased production and also resulted in making better glass. While it is true that sometimes the simplest inventions are the most concealed, we can scarcely regard "shawling" as other than an obvious expedient, and certainly lies on the very borderland of a patentable invention.

Testimony was taken on the question of prior use. Many glass workers of large practical experience have testified to the use of this method years before this patent was obtained. There is nothing in the record to impeach their credibility as witnesses, and they speak positively as to the fact. It is undoubtedly true that the practice of "shawling" occurred only under certain circumstances and at intervals more or less rare as conditions called for. This accounts for the fact that a large number of witnesses equally credible and equally experienced had not seen, and perhaps had not known, of any such practice. But this testimony is negative, while that of defendant's witnesses is positive. The latter, therefore, is stronger and entitled to much greater weight than the former. As a distinguished authority on evidence has well said, in speaking of the rule, "The witness who testifies to a negative may have forgotten what actually occurred, while it is impossible to remember what never existed."

I am satisfied, therefore, that if the patent discloses invention at all, it is void by reason of prior use, and as to it the bill must be dismissed.

A decree may be drawn in accordance with this opinion.